## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| DAVID SCHIESSER, on behalf of himself and all others similarly situated, | Case No: |
| Plaintiff, | |
| vs. | JURY TRIAL DEMANDED |
| FORD MOTOR COMPANY, | |
| Defendant | |

## CLASS ACTION COMPLAINT

Plaintiff David Schiesser brings this action on behalf of himself and all others similarly situated against Defendant Ford Motor Company, stating as follows, upon information and belief, except as to the facts pertaining to him which are based on personal knowledge:

### I.       INTRODUCTION

1.       This case concerns the sale of certain Ford and Lincoln vehicles which have a material safety defect in their exhaust system. The exhaust system as sold to Plaintiff and the putative Class Members contains a defect (the "Defect") that allows harmful and potentially lethal exhaust gases into the passenger compartment of certain models of Ford and Lincoln vehicles.   Ford is aware of the problem, and has issued a service bulletin, but the proposed fix is ineffective and Ford as yet has failed to notify the owners or prospective purchasers of a solution to the problem.

2.       Because of the Defect, the vehicles will be less desirable both to their current owners, who would not have purchased them had the truth been told, and will also be worth less in the secondary market.  Current owners are rightfully reluctant to use and enjoy their vehicles,

as the Defect exists at the point of sale of the vehicles and they have no way of knowing when the Defect might cause an accident or other personal harm.

## II.    PARTIES

3.    Plaintiff David Schiesser ("Plaintiff") is and was at all relevant times a resident of Orland Park, Illinois, and a citizen of the State of Illinois.

4.    Defendant Ford Motor Company ("Ford" or "Defendant") is the second-largest domestic automobile manufacturer and fifth-largest in the world as of 2010, and is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan.  Ford is duly qualified and licensed to do business in the State of Illinois, and in fact does business in all 50 states (including also the District of Columbia).

## III.    JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy in this class action exceeds $5,000,000, exclusive of interest and costs, and some members of the Class, including Plaintiff, are citizens of states other than the states in which Ford is incorporated and has its principal places of business.

6.    This Court has personal jurisdiction over Ford because it is duly qualified and licensed to do business and in fact does substantial business in the State of Illinois.

7.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Additionally, Ford has operations and sales in this District.

## IV.    FACTUAL ALLEGATIONS

8.    This case arises from Ford's sale and lease of hundreds of thousands of Explorer model vehicles, and other similar vehicles, that Ford knew or should have known are dangerous

and defective. The exhaust systems of these vehicles are defectively designed in such a way that they may let exhaust and other gases, including lethal quantities of carbon monoxide, enter the passenger compartments of the vehicles. The potential exposure to carbon monoxide renders these vehicles unsafe to drive.

9. Ford's Technical Service Bulletin 12-12-4 titled "Explorer Exhaust Odor in Vehicle," acknowledges that "[s]ome 2011-2013 Explorer vehicles may exhibit an exhaust odor in the vehicle with the auxiliary climate control system on. Customers may indicate the odor smells like sulfur." Ford's TSB 12-12-4 provides instructions that Ford claims will correct the exhaust odor in 2011 through 2013 model year Ford Explorers.

10. Subsequent to TSB 12-12-4, Ford issued Technical Service Bulletin 14-0130 ("TSB 14-0130").

11. Titled "Exhaust Odor in Vehicle," TSB 14-0130 also acknowledges an exhaust odor in Explorer vehicles, and adds the 2014 and 2015 model year Explorers to the list of affected vehicles. TSB 14-0130 includes the same or similar service procedures outlined in TSB 12-12-4, and adds certain procedures not included in TSB 12-12-4.

12. Ford's TSBs 12-12-4 and 14-0130, however, do not correct the condition, and they fail to acknowledge that carbon monoxide may enter the passenger compartment of affected vehicles. Ford's TSBs 12-12-4 and 14-0130 are provided to authorized dealerships, but do not directly notify non-Ford automotive repair facilities about the defects associated with TSBs 12-12-4 and 14-0130. Further, although Ford has received numerous complaints relating to exhaust entering the passenger compartments of 2011 through 2015 model year Ford Explorers, and it developed a purported fix to the problem, Ford provided no notice to plaintiff

3

or the proposed Class Members about the Defect and the potential exposure to lethal carbon monoxide in 2011 through 2015 model year Ford Explorers.

13.     Upon information and belief, Ford sold or leased hundreds of thousands of defective vehicles in Illinois. Each such vehicle was sold or leased in a dangerous and defective condition because each such vehicle contains design flaws, and/or an exhaust and/or HVAC system that permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment during the normal and customary use of such vehicles.

14.     Carbon monoxide is a colorless, odorless, and tasteless gas that is toxic to humans, and deadly if ingested in high concentrations.

15.     Ford designed, manufactured, sold and leased the 2011 through 2015 model year Ford Explorers when it knew or should have known of such defects, and failed to notify plaintiff and the proposed Class Members of the Defect that exposed them to a material safety hazard.

16.     Ford has also "discovered" that its model years 2011-2013 Ford Edge and Lincoln MKX vehicles (also manufactured by Ford) with 3.5L and 3.7L TIVCT engines exhibit the same condition for the same reason as the Explorer. Ford has prepared, though has not released, TSBs that describe the exhaust problem with these vehicles.[1]

17.     The Defect as described herein is substantially similar across all Vehicles with regard to design, engineering, manufacturing, and testing.  The Vehicles were designed, engineered, and manufactured by Ford with design flaws and/or defective exhaust and/or HVAC systems that permit carbon monoxide and exhaust to enter into the passenger compartments of those vehicles while being driven in a normal and customary manner.

---

[1] "Vehicles" refers to 2011-2015 model year Ford Explorer vehicles, 2011-2013 model year Ford Edge vehicles, and 2011-2013 Lincoln MKX vehicles.

18.    Ford designed, manufactured, assembled, inspected, distributed, sold and leased the Vehicles in a manner so as to render the subject vehicles defective and unsafe for their intended use and purpose by, among other things:

    a.    Designing the vehicles such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of the vehicles;

    b.    Designing the bumpers and/or tailpipes on the vehicles such that exhaust and other gases, including carbon monoxide, may accumulate behind the bumper and within the interior and exterior panels, allowing those gases to permeate the passenger compartments of the vehicles;

    c.    Designing, manufacturing, and assembling the vehicles using defective rear air extractors which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

    d.    Designing, manufacturing, and assembling the liftgates in the rear of the vehicles using defective drain valves, which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

    e.    Designing, manufacturing, and assembling the vehicles with sheet metal panels and overlaps which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

    f.    Designing, manufacturing, and assembling the vehicles with joints and seams which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles; and,

    g.    Designing, manufacturing, and assembling the vehicles with rear auxiliary air conditioning system parts which are defectively designed and/or located too

close in proximity to the driver side rear air extractor, such that exhaust and other gases, including carbon monoxide, may enter the auxiliary air conditioning system and the passenger compartments of the vehicles.

19.     Ford knew or should have known that the Vehicles were dangerous and defective such that drivers and passengers of those vehicles may be exposed to carbon monoxide and other dangerous gases while the vehicles are in operation.

20.     The defective Vehicles were sold or leased pursuant to express and implied warranties.  These warranties assured consumers that the Vehicles were free from defects and were properly equipped for the use for which they were intended.  At the time the defective Vehicles were sold or leased by Ford directly and through its authorized agents, the Vehicles were in violation of express and implied warranties.  All of the defective vehicles are still within the dates of the express written warranties, or the time or mileage limits in the express warranties should be inapplicable given Ford's fraudulent conduct, among other things.

21.     In promoting, selling and repairing its defective Vehicles, Ford acts through numerous authorized dealers who act as Ford's agents, and who represent themselves to the public, as exclusive Ford representatives and agents.  That the dealers act as Ford's agents is demonstrated by the fact that: (i) the warranties provided by Ford for the defective Vehicles directs consumers to take their vehicles to authorized dealerships for repairs or services; (ii) Ford dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers; (iii) Ford directs its authorized dealers as to the manner in which they can respond to complaints and inquiries concerning defective vehicles; and (iv) Ford has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes

and exercises substantial control over the operations of its dealers and the dealers' interaction with the public.

22.     Ford's control over the actions of its dealers is also evidenced by its implementation of the company's express and implied warranties as they relate to the Defect alleged herein.  Authorized Ford dealerships are instructed by Ford to address complaints of an exhaust odor by prescribing and implementing TSBs 12-12-4 and 14-0130.

**Ford Acknowledged the Subject Vehicles' Defective Condition in TSBs 12-12-4 and 14-0130**

23.     In response to customer complaints of an exhaust odor in the passenger compartments of Ford Explorers, Ford issued TSB 12-12-4 in or about December 2012. TSB 12-12-4 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2013 model year Ford Explorers.

24.     In or about July 2014, Ford issued TSB 14-0130, which added 2014 and 2015 model year Explorers to the list of affected vehicles.  TSB 14-0130 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2015 model year Ford Explorers.

25.     Despite issuing TSBs 12-12-4 and 14-0130, Ford did not inform Plaintiff or the members of the proposed Class of the Defect in 2011 through 2015 model year Ford Explorers, despite the fact that the Defect presented life safety issues to occupants of the vehicles.

26.     Notably, TSBs 12-12-4 and 14-0130 fail to disclose that the exhaust odor is accompanied in the passenger compartment by lethal carbon monoxide.

27.     At all material times, Ford has failed to inform customers who purchased and/or leased 2011 through 2015 model year Ford Explorers that they are unsafe for operation or that

they were designed, engineered, and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of such vehicles.

28.     In addition, TSBs 12-12-4 and 14-0130 do not identify a specific and effective fix to the exhaust odor problem.  Rather, TSBs 12-12-4 and 14-0130 require various replacements and/or repairs to several unrelated vehicle parts.  This demonstrates that Ford knew of the Defect, but did not know of a specific, effective fix to protect occupants of the 2011 through 2015 model year Ford Explorers from exhaust and other gases, including carbon monoxide. Based upon information and belief, Ford issued TSBs 12-12-4 and 14-0130 *hoping*, but not knowing, that any one of the various replacements and/or repairs identified therein would remedy the exhaust odor complaints.

### Ford's TSBs 12-12-4 and 14-0130 Fail to Repair the Defects

29.     Ford's TSBs 12-12-4 and 14-0130 fail to repair the exhaust odor problem, and vehicles which have received the repairs outlined in TSBs 12-12-4 and 14-0130 may continue to have exhaust and other gases—including carbon monoxide—enter the passenger compartment.

30.     TSBs 12-12-4 and 14-0130 identify flaws in the initial design and manufacture of the 2011 through 2015 model year Ford Explorer, and prescribe repairs and/or replacements which are inadequate and equally flawed and defective.

31.     In TSBs 12-12-4 and 14-0130, Ford requires installation or use of the following replacement parts in the subject vehicles, among others: (i) a dual rate air extractor (part number BB5Z-61280B62-A under TSB 12-12-4 and part number BB5Z-61280B62-B under TSB 14-0130); (ii) valve assembly auto drains (part number 4M8Z-54280B62-A); and (iii) Motorcraft® Seam sealer (part number TA-2).

32. TSBs 12-12-4 and 14-0130 require that the dual rate air extractor replace the driver side rear air extractor initially installed on the Ford Explorer. The rear air extractor initially installed was dangerous and defective because it permitted exhaust and other gases, including carbon monoxide, to permeate the exterior panels of the Explorer vehicles and enter the passenger compartment. Based upon information and belief, Ford requires the replacement of the driver side rear air extractor, and not the passenger side rear extractor, because the air intake from the auxiliary air conditioning system is situated dangerously close in proximity to the driver side rear air extractor. The placement of the air intake system too close to the rear air extractor allows exhaust and other gases, including carbon monoxide, to enter the auxiliary air condition system.

33. The replacement part— a dual rate air extractor—is formed of polypropylene and overmolded with thermoplastic elastomer (TPE). The dual rate air extractor includes "living hinges" and plastic torsional springs that are meant to function as a one-way pneumatic valve.

34. The dual rate air extractor has a listed purchase price of $86.33, whereas the initially-installed air extractor has a listed purchase price of $22.50. However, the dual rate air extractor fails to prevent exhaust and other gases, including carbon monoxide, from entering the auxiliary air condition systems and the passenger compartments of the subject vehicles. The replacement dual rate air extractors are therefore ineffective, dangerous and defective.

35. In addition, Ford modifies the dual rate air extractors used as replacement parts per TSBs 12-12-4 and 14-0130 by haphazardly adding a silicone-like white substance to the uppermost of the three "living hinges." Based upon information and belief, the silicone-like white substance found on replacement part number BB5Z-61280B62-A is not included, and was not meant to be included, as part of the dual rate air extractor as designed by its manufacturer.

9

Moreover, the silicone-like white substance added by Ford to the dual rate air extractor causes the "living hinges" to remain open, permitting exhaust and other gases to permeate the exterior panels of the vehicles, and enter the passenger compartment.

36.    Ford designed, manufactured and engineered the 2011 through 2015 model year Ford Explorers using valve assembly auto drains on the rear liftgate of the vehicles which are dangerous and defective because the parts permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment.  The replacement valve assembly auto drains fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment, and thus, they are ineffective, dangerous and defective.

37.    Ford designed, manufactured, engineered, and assembled the 2011 through 2015 model year Ford Explorers without properly sealing the horizontal sheet metal lap joints on the left and right sides of the underbody of the subject vehicles.  Ford additionally designed, manufactured, engineered, and assembled the 2011 through 2015 model year Ford Explorers without properly sealing the rear sheet metal overlap flange across the rear of the vehicle, and the auxiliary air conditioning lines.   Accordingly, TSBs 12-12-4 and 14-0130 require that the foregoing joints, flange and lines be sprayed with "generous amounts" of rubberized undercoating, and seam sealer.  However, the rubberized undercoating and seam sealer fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

38.    TSB 14-0130 additionally requires reprogramming the HVAC module; however, this reprogramming fails to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

10

39.     As noted above, Ford manufactures two other brands of SUVs that exhibit the same problem. Ford has identified that model years 2011-2013 of its Edge and MKX cars, with either a 3.5L or 3.7TIVCT engine, have the same exhaust contamination problem as does the Explorer, and for the same reasons. These vehicles are built on the same or comparable platforms, have the same or comparable design, use the same or comparable components, and have the same problem—namely, exhaust in the passenger cabins.

**Ford's Conduct and/or Inaction Has Damaged Plaintiff and Members of the Proposed Class**

40.     Plaintiff and each member of the proposed Class has been damaged by Ford's conduct and/or inaction, as they have been exposed to harmful carbon monoxide and exhaust, they unknowingly purchased defective vehicles which cannot be safely operated, they have been forced to pay, or will pay, substantial amounts of money to repair the vehicles, if a repair can be made, and the value of their affected vehicles has been diminished because of the Defect.

41.     A vehicle containing the Defect described herein—that is, a Defect that permits the entry of carbon monoxide and other gases into the passenger compartment of the vehicle—is worth less than a vehicle free from such Defect.  The Defect represents a safety issue and a health hazard, and renders the Vehicles valueless.  At the time plaintiff purchased the vehicle, he paid a price based on the value of a vehicle free of such a Defect.

42.      Plaintiff brings this action individually and on behalf of all other current owners of the affected Vehicles. Plaintiff seeks damages, injunctive relief, and equitable relief for the conduct of Ford related to the Defect Fords alleged in this complaint.

**Plaintiff's Purchase of his Vehicle**

43.     Plaintiff Schiesser selected and ultimately purchased his vehicle, a model year 2013 Ford Explorer, based on Ford's reputation and in the belief that the Explorer was a safe

vehicle, from Joe Rizza Ford in Orland Park, Illinois, in June of 2012. Plaintiff was reasonable in relying on Ford to manufacture a vehicle that performed in a safe operation.

44. In or about August or September of 2015, the Plaintiff began to notice exhaust fumes accumulating in the cabin of his Explorer. The smell was especially prevalent whenever the outside air vents were on and the vehicle came to a stop.

45. Plaintiff brought the car in to a Ford dealer, Joe Rizza Ford in Orland Park, Illinois, for service in or around early October 2015, and asked them to fix the problem. Although the 2012 Ford Service Bulletin was not readily accessible to consumers, the Plaintiff brought it to the attention to the dealership after he found a reference to it online. The service manager informed the Plaintiff that he had called Ford and they proposed two possible solutions—one that would cost $800, and one that would cost $900—but would not guarantee that either fix would work. Because neither "fix" was guaranteed to work, Plaintiff elected not to incur the cost of the repair.

46. The advertisements and representations made by Ford contained neither a disclosure about the Defect nor did they inform the Plaintiff and putative Class Members that there was no fix to the Defect. To the contrary: Ford represented that its cars were safe.

47. Plaintiff and putative Class Members have suffered ascertainable losses as a result of Ford's omissions and/or misrepresentations associated with their Vehicles in the form of diminished value of their Vehicles and loss of use. Had Plaintiff known of the presence of the problem, he would not have purchased his vehicle.

48. As a result of having received notification of the problem, Plaintiff, like the other Class Members, is reluctant to drive and enjoy his vehicle. The risk of having an exhaust gas

leak that could cause serious physical harm from inhalation makes the Vehicles unreasonably dangerous and unfit for safe operation.

49.     Plaintiff and putative Class Members would not have purchased their Vehicles or would have paid far less for them had they known of the presence of the Defect. Further, they have all suffered loss of use and reduced resale value as a result of the existence of the Defect which has now—after their Vehicles were purchased—been made public knowledge.

50.     Ford's New Vehicle Limited Warranty, applicable to all Ford Explorers, Ford Edges and Lincoln MKX models, states that "if: - your Ford vehicle is properly operated and maintained, and - was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship." The remedy under this written warranty, and any implied warranty, is purported to be "limited to repair, replacement, or adjustment of defective parts;" and the duration of any implied warranty "including the implied warranty of merchantability and fitness for a particular purpose, are limited to the duration of the original warranty."

**Ford's Warranty is Procedurally and Substantively Unconscionable**

51.     Ford's warranty provides in part:

Ford and your dealer are not responsible for any time or income that you lose, any inconvenience you might be caused, the loss of your transportation or use of your vehicle, the cost of rental vehicles, fuel, telephone, travel, meals, or lodging, the loss of personal or commercial property, the loss of revenue, or for any other incidental or consequential damages you may have.

                                        ***

Ford shall not be liable for any damages caused by delay in delivery or furnishing of any products and/or services.

13

You may have some implied warranties. For example, you may have an
implied warranty of merchantability (that the car or light truck is
reasonably fit for the general purpose for which it was sold) or an
implied warranty of fitness for a particular purpose (that the car or
light truck is suitable for your special purposes), if a special purpose
was specifically disclosed to Ford itself not merely to the dealer
before your purchase, and Ford itself not just the dealer told you the
vehicle would be suitable for that purpose.
These implied warranties are limited, to the extent allowed by law, to
the time period covered by the written warranties, or to the applicable
time period provided by state law, whichever period is shorter.

52.     Ford's warranty as excerpted in part above, purports to disclaim responsibility

for "loss of time," "loss of your transportation or use of the vehicle," "the cost of rental vehicles,

fuel, telephone, travel, meals, or lodging, the loss of personal or commercial property, the loss

of revenue, or for any other incidental or consequential damages you may have."  Further, the

warranty is limited to three years from the date of purchase, or 36,000 miles.

53.     At all times relevant, Ford is and was a merchant in the business of

manufacturing, marketing, and selling vehicles. Further, Ford knew or should have known that

the exhaust systems were defective and would necessitate extra costs for labor, parts, and

consequential and incidental damages.   Ford's internal testing systems likely showed the

Vehicles' Defect since before the first Vehicles were sold in 2010, and Ford had notice of

complaints and at the very least prior to the issuance of the TSB (if not much, much earlier),

which demonstrated that purchasers of the Vehicles were incurring such costs and damages due

to the Defect.

54.     Plaintiff, by contrast, is not an expert in manufacturing vehicles and did not know

about the Vehicles' Defects. At the time the Plaintiff purchased his Vehicle, he expected it to

perform as marketed and to not potentially cause him harm.

14

55.     The limitations on the warranty, including exclusions and limitations as to labor costs and replacement of parts, the use of an authorized Ford dealer to effectuate repairs, and incidental and consequential damages including but not limited to loss of value of the vehicle itself, loss of time, loss of use, as well as the time and mileage limitations of three years or 36,000 miles, and the other various limitations, are unconscionable under Uniform Commercial Code ("UCC") § 2-302, as adopted by the Illinois in 810 ILCS 5/2-302, and thus do not otherwise prohibit Plaintiff and the Class from obtaining appropriate relief.

## V.     CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action on behalf of himself and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following defined Class (the Class"):

> All persons who purchased or leased in the State of Illinois at least one of the following vehicles: 2011-2015 model year Ford Explorer vehicles; 2011-2013 model year Ford Edge vehicles with either a 3.5L or 3.7L TIV-CT engine; or 2011-2013 Lincoln MKX vehicles with either a 3.5L or 3.7L TIV-CT engine.

The claims brought for the Class do not include any claims for personal injury, or for property damage outside of the damage to other parts of the Vehicles themselves caused by defects in the exhaust system.

57.     Members of the Class are ascertainable based upon the objective criteria as outlined herein.

58.     Specifically excluded from the Class above are: (a) all federal court judges who preside over this case and their spouses; (b) all persons who elect to exclude themselves from the Class; and (c) Ford's employees, officers, directors, agents, and representatives and their immediate family members. Also excluded from the Class are Ford and its subsidiaries and

affiliates; and governmental entities. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

59. Class Members seek relief under both Rule 23(b)(2) and Rule 23 (b)(3), as well as certification of a class as to issues affecting the Class under Rule 23(c)(4) of the Federal Rules of Civil Procedure. Specifically, under Rule 23(b)(2), Class Members seek to have the Court declare any limits on full recovery by the Class Members contained in the warranties to be unenforceable and otherwise null and void. This relief is based solely upon Ford's past and current systematic practices and policy of limiting remedies of the Class Members, and thus declaratory relief is thus appropriate for the Class as whole.

60. Under Rule 23(b)(3), various common issues of fact and law as to Defendant's actions and the relief to which Plaintiff and the Class are entitled are common to all and predominate over any common issues as set forth below. Under Rule 23(c)(4), the common issues of the existence of the Defect and the proper interpretation of the warranty terms are also appropriate for certification as issues affecting all Class Members.

### A. Numerosity

61. The Class is composed of thousands of owners of Vehicles, making joinder impracticable. The disposition of their claims in a single class action will provide substantial benefits to all parties and to the Court.

### B. Typicality

62. There is a well-defined community of interest among the Class Members. Plaintiff's claims are typical of the Class Members' claims in that the representative Plaintiff, like all Class Members, owns one of the Vehicles manufactured, marketed, and sold by Ford. Plaintiff, like all Class Members, has been damaged by Ford's misconduct. The factual basis of

16

Ford's misconduct is common to all Class Members and represents a common thread of misconduct and/or acts and/or omissions resulting in similar injuries to all Class Members.

**C.      Commonality**

63.      There are common questions of law and fact making this action appropriate for class action treatment. Some of the common questions include:

      a.      Whether Ford fraudulently concealed from and/or failed to disclose to the Plaintiff and Class Members the existence of the Defect;

      b.      Whether Ford's conduct in selling and marketing the listed vehicles was negligent, wanton, or willful;

      c.      Whether Ford breached its express warranty to Plaintiff and Class Members;

      d.      Whether Ford breached its implied warranty to Plaintiff and Class Members;

      e.      Whether the performance of the listed vehicles is not as advertised and/or promoted by Ford;

      f.      Whether the Plaintiff and the Class Members are entitled to damages and the amount of such damages; and

      g.      Whether the Plaintiff and the Class Members are threatened with irreparable harm and whether they are entitled to injunctive and/or other equitable relief, including requiring Ford to reimburse the Class, and buy back and/or replace the vehicles.

      h.      Whether each Vehicle is defective such that carbon monoxide and exhaust may enter the passenger compartments of such vehicles; whether the Vehicles suffer from a Defect, are unreasonable dangerous and/or are unfit for their intended use;

      i.      Whether Ford has knowledge of the Defect;

17

j.   When Ford learned of the Defect;

k.   Whether Ford misrepresented that the affected vehicles were safe;

l.   Whether Ford has a fix to the Defect and, if so, how much the fix will cost;

m.   Whether the Defect reduces the value of the affected Vehicles;

n.   Whether Ford's express warranties cover the Defect;

o.   Whether Ford negligently designed/engineered/manufactured the affected vehicles; and

p.   Whether plaintiff and the Class have suffered damages as a result of the conduct alleged, and if so, the measure of such damage.

**D.     Adequacy of Representation**

64.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained the undersigned counsel, with substantial experience in prosecuting class actions.  Plaintiff and his counsel are committed to prosecuting this case vigorously on behalf of the Class and have the financial resources to do so.  Neither Plaintiff nor his counsel have any interests adverse to those of the Class.

**E.     Superiority and Manageability**

65.     A class action is superior to other methods for the fair and efficient adjudication of the subject controversy. Absent a class action, most Class Members will likely find the cost of litigating their individual claims to be prohibitive, and will have no effective remedy at all. Because of the relatively small size of the individual Class Members' claims, few Class Members could likely afford to seek legal redress for Ford's misconduct. Absent a class action, Class Members will continue to incur damages and be at risk of irreparable harm while Ford's misconduct will proceed without remedy.

66.     The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and litigants, and promotes consistency and efficiency of adjudication. Additionally, Ford engaged in the same or similar misconduct towards the Plaintiff and Class Members, thus requiring court imposition of uniform relief to insure compatible standards of conduct toward the Class as a whole.

## VI.     TOLLING OF STATUTE OF LIMITATIONS

67.     All limitations periods were tolled by the doctrines of fraudulent concealment, the discovery rule, and/or equitable tolling. As alleged herein, Ford wrongfully concealed the facts relating to the claims alleged.  Plaintiff and Class Members did not discover the operative facts that are the basis of their claims because they were concealed from the public, including Plaintiff and the Class Members, by Ford. No amount of diligence by Plaintiff or Class Members could have led to discovery of these facts because they were kept secret by Ford and, therefore, Plaintiff and Class Members were not at fault for failing to discover these facts, nor did they have actual or presumptive knowledge of facts sufficient to put them on inquiry.

68.     Class Members had no way of knowing about Ford's deception with respect to the Defect.

69.     Ford's TSBs acted to conceal the existence of further problems which would not be cured by the implementation of their suggested solutions.

## VII.     Causes of Action

### First Cause of Action
### Breach Of Express Warranty
On behalf of Plaintiff and the Putative Class

70.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

19

71.     When plaintiff and members of the Class purchased and/or leased their Vehicles, Ford expressly warranted that the Vehicles would be free from defects in design, materials and workmanship.  Ford promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

72.     When plaintiff and members of the Class purchased and/or leased the Vehicles, Ford impliedly warranted that the vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a safe and non-defective condition for use by owners and lessees, and were not otherwise injurious to consumers.  Ford was under a duty to design, construct, manufacture, inspect and test the Vehicles so as to make them suitable for the ordinary purpose of their use.

73.     The Vehicles described above share a common Defect in the way their exhaust systems were designed and/or manufactured.  The exhaust systems were defectively designed so that they allow exhaust and other gases, including carbon monoxide, to enter the passenger compartment of the Vehicles during their normal and customary use.  Ford is aware of the Defect, and has acknowledged the problem of an exhaust odor inside the passenger compartment of certain vehicles by its issuance of TSBs 12-12-4 and 14-0130.  However, TSBs 12-12-4 and 14-0130 do not disclose the presence of carbon monoxide inside the passenger compartment of the Vehicles, nor do they fix the problem of exhaust and other gases entering the passenger compartment.  Ford has breached its express and implied warranties by failing to disclose a safety Defect in the subject vehicles, by failing to fix the Defect in the subject vehicles, and by selling or leasing vehicles which are unsafe and unfit for the ordinary purposes for which they are intended to be used.

74.    Plaintiff and each of the members of the Class have had sufficient direct dealings with either Ford or its agent dealerships to establish privity of contract between Ford, on the one hand, and Plaintiff and each of the members of the Class, on the other hand.  Notwithstanding, plaintiff and each of the members of the Class are the intended beneficiaries of Ford's express and implied warranties.  The dealers were not intended to be the ultimate consumers of the subject vehicles, and have no rights under the warranty agreements provided by Ford.  Ford's warranties were designed for and intended to benefit the consumers only.

75.    Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.  Ford has known, or should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the subject Vehicles' Defect resulting in exhaust and other gases, including carbon monoxide, entering the passenger compartment of such vehicles.  Despite its knowledge, Ford has failed to disclose the existence of this Defect and the risk of carbon monoxide exposure, and has failed to rectify the situation.

76.    Plaintiff afforded Ford an opportunity to cure by bringing his vehicle into an authorized Ford dealership for service, and notifying the dealership of an exhaust odor in the passenger compartment.  Plaintiff was specifically informed by Ford's authorized dealer that Ford knows of the problem, and does not have a viable means to fix the problem.  Under the circumstances, any requirement that plaintiff afford Ford an additional opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

77.    This warranty became part of the basis of the bargain.

78.    Ford breached this express warranty.

79.    Ford has actual knowledge of the specific common Defect associated with the Vehicles and the problems resulting therefrom.

21

80. Ford was on notice of the problems for some time, as there were TSBs which failed to fix all of the exhaust gas leak problems.

81. Ford's conduct is the direct and proximate cause of Plaintiff's and the Class Members' injuries.

82. Plaintiff, individually and on behalf of the other Class Members, seeks all damages permitted by law, including diminution in value of their vehicles, loss of the benefit of the bargain, and/or out-of-pocket expenses in an amount to be proven at trial.

83. Plaintiff and the Class Members are entitled to legal and equitable relief against Ford, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

**Second Cause of Action**
**Breach Of Implied Warranty Of Merchantability**
On behalf of Plaintiff and the Putative Class

84. Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

85. When the Vehicles left Ford's possession, they were unmerchantable because they were unfit for their ordinary purpose and contained material Defects which rendered them unsafe to drive.

86. Ford designed, engineered, tested, and manufactured the Vehicles and is a merchant of other vehicles. Ford sells its vehicles through its authorized agents, and sold the Vehicles described herein to Plaintiff and the putative Class Members.

87. Plaintiff and the Class Members purchased and/or leased their Vehicles and used them in the normal manner for which the Vehicles were designed.

88.     Ford has actual knowledge of the specific Defect associated with the listed Vehicles and the problems resulting therefrom. To date, Ford has neither adequately cured the Defect nor replaced the defective Vehicles.

89.     As a result of Ford's breach of implied warranty of merchantability, Plaintiff and the Class Members suffered damages including diminution in the value of their vehicles and out of pocket expenses.

**Third Cause of Action**
**Magnuson-Moss Act—Express and Implied Warranties**
**15 U.S.C. §§ 2301,** *et seq.*
On behalf of Plaintiff and the Putative Class

90.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

91.     The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

92.     Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

93.     Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

94.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty

95.     Ford provided Plaintiff and Class Members with "implied warranties," as that term is defined in 15 U.S.C. § 2301(7).

96.     Ford has breached these implied warranties as described herein. Without limitation, and as described herein, Ford's Vehicles are defective, which resulted in the problems and failures also described above.

97.     When Plaintiff and members of the Class purchased and/or leased their Vehicles, Ford expressly warranted that the Vehicles would be free from defects in design, materials, and workmanship.  Ford promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

98.     When plaintiff and members of the Class purchased and/or leased Ford Vehicles, Ford impliedly warranted that the vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used (including the guarantee that they were in a safe and non-defective condition for use by owners and lessees), and would not otherwise contain material safety defects.  Ford was under a duty to design, engineer, construct, manufacture, inspect, and test the vehicles so as to make them suitable for the ordinary purpose of their use.

99.     The Vehicles described above share a common Defect in that they have been designed and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartment of the Vehicles during their normal and customary use.  Ford is aware of the Defect, and has acknowledged the problem of an exhaust odor inside the passenger compartment of the Vehicles by its issuance of TSBs 12-12-4 and 14-0130, and the creation of similar TSBs for other Vehicles.  However, TSBs 12-12-4 and 14-0130 do not disclose the presence of carbon monoxide inside the passenger compartment of the subject vehicles, nor do they fix the problem of exhaust and other gases entering the passenger compartment.  Ford has breached its express and implied warranties by failing to disclose a material safety Defect in the Vehicles, by failing to fix the Defect in the Vehicles, and by selling

24

or leasing vehicles which are unsafe and unfit for the ordinary purposes for which they are intended to be used.

100.    Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile.  Ford has known, should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the subject vehicles' Defect resulting in exhaust and other gases, including carbon monoxide, entering the passenger compartment of such vehicles.  Notwithstanding, Ford has failed to disclose the existence of this Defect and the risk of carbon monoxide exposure, and has failed to rectify the situation.

101.    Plaintiff afforded Ford an opportunity to cure by bringing his vehicle into an authorized Ford dealership for service, and notifying the dealership of an exhaust odor in the passenger compartment. Plaintiff was specifically informed by Ford's authorized dealer that Ford knows of the problem, and does not have a means to fix the problem.  Rather than spend money out-of-pocket for a repair that was not guaranteed to work, Plaintiff elected not to pay for the work outlined in the TSBs.  Under the circumstances, any requirement that plaintiff afford Ford an  additional opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

102.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000.00, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

103.    Plaintiff, individually and on behalf of the other Class Members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

104.    By Ford's conduct as described herein, including Ford's knowledge of the Defect inherent in the vehicles and its action, and inaction, in the face of the knowledge, Ford has failed to comply with its obligations under its written and implied promises, warranties, and representations.

105.    In its capacity as a warrantor, and by the conduct described herein, any attempts by Ford to limit the implied warranties in a manner that would exclude coverage of the defective exhaust systems is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective exhaust systems is null and void.

106.    All jurisdictional prerequisites have been satisfied.

107.    Plaintiff and members of the Class are in privity with Ford in that they purchased the Vehicles from Ford or its agents. Plaintiff has had sufficient direct dealings with Defendant and/or its authorized dealers, franchisees, representatives, and agents to establish privity of contract. Alternatively, Plaintiff and Class Members are intended third-party beneficiaries of contracts, including express warranties, between Ford and its dealers, franchisees, representatives and agents; Ford's advertisements were aimed at Plaintiff and Class Members, and Ford's warranties were expressly written for the benefit of Plaintiff and Class Members as end users of the Vehicles. Ford's authorized dealers, franchisees, representatives, and agents, on the other hand, were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided by Ford; these intermediary entities made no changes to Ford's Vehicles, nor made any additions to the warranties issued by Defendant. Defendant is estopped from limiting claims for common law and statutory violations based on a defense of lack of privity.  Further, Ford's applicable express warranties state that the warranties are made to the first purchaser and subsequent purchasers.

108.     As a result of Ford's breach of express and implied warranties, Plaintiff and the Class Members are entitled to revoke their acceptance of the vehicles, obtain damages and equitable relief, and obtain costs pursuant to 15 U.S.C. §2310.

**Fourth Cause Of Action**
**Illinois Uniform Deceptive Trade Practices Act**
**815 ILCS 510/1**
On behalf of Plaintiff and the Putative Class

108.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

109.     Under the Illinois Uniform Deceptive Trade Practice Act ("DTPA"), 815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation," the person does any of the following: (1) represents that goods or services have characteristics that they do not have; (2) represents that goods or services are of a particular standard, quality, or grade if they are of another; or (3) engaging in any other conduct which creates a likelihood of confusion or misunderstanding.

110.     Ford is a "person" within the meaning of 815 ILCS 510/1(5).

111.     Ford's actions, as alleged herein, constitute deceptive, unfair, fraudulent, and unlawful practices committed in violation of 815 ILCS 510/1, *et seq.*

112.     All of the conduct alleged herein occurred in the course of Ford's business and was part of a patter or generalized course of conduct.

113.     Ford has long known the Vehicles are defective—including when it developed, manufactured, marketed, and sold the Vehicles. Furthermore, Ford knows the Defect poses serious safety risks to consumers like Plaintiff and the putative Class Members.

114.     Nonetheless, Ford concealed the Defect from consumers—including the fact that harmful carbon monoxide can enter the cabins of the Vehicles. Then, when Ford created TSBs

to address the Defect, the TSBs did not solve the safety risk the Defect created; but rather, would require Plaintiff and putative Class Members to spend hundreds of dollars on a "fix" that was not guaranteed to resolve the problem.

115.    The Defect created and continues to create serious safety risks, which were hidden from consumers.

116.    No reasonable consumer would have knowingly bought or leased a Vehicle if that consumer had known it was manufactured and distributed with the Defect.

117.    Ford did not recall the defective Vehicles, nor did it notify consumers that the Vehicles could allow harmful carbon monoxide to enter the Vehicles' cabins, were dangerous to occupants, and should be replaced.

118.    Ford owed Plaintiff and the putative Class Members a duty to disclose the true safety and reliability of the Class Vehicles because Ford: (1) possessed exclusive knowledge of the dangers and risks posed by the Defect; (2) intentionally concealed the dangers and risks posed by the Defect; and/or (3) made incomplete representations about the safety and reliability of the Vehicles while purposefully withholding material facts from Plaintiff that contradicted those representations.

119.    By concealing the serious and material safety risk posed by its Vehicles, and representing that the Vehicles were safe, Ford engaged in actionable conduct within the meaning of the DTPA.

120.    Had Ford disclosed the true quality and defective nature of the Vehicles, Plaintiff putative Class Members would not have purchased the Vehicles or would have paid substantially less for them.

121.     Ford breached its duty to disclose the safety risks and the Defect when it instead sold and distributed the Class Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

122.     Ford's deceptive, unfair, fraudulent and unlawful conduct alleged herein was designed to induce and did induce Plaintiff and the putative Class Members to purchase the Class Vehicles.

123.     Ford violated the DTPA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it sold and distributed the Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

124.     As a direct and proximate result of Ford's violation of the Illinois DTPA, Plaintiff and the putative Class Members were damaged.

**Fifth Cause of Action**
**Unjust Enrichment**
On behalf of Plaintiff and the Putative Class

125.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above. Plaintiff brings this cause of action in the alternative to his warranty-based claims.

126.     Ford has been unjustly enriched in that it intentionally sold vehicles with defective exhaust systems which rendered the vehicles unsafe.

127.     When purchasing their vehicles, Plaintiff and the other Class Members reasonably believed that the subject vehicles were safe to drive and use for their intended purpose.

128.     Plaintiff and the other Class Members did not receive the benefit of their bargain because the Vehicles were not safe to drive and cannot be readily fixed under Ford's TSBs so

29

that they are safe to drive. In fact, the Vehicles are arguably worthless in view of this serious problem.

129.    Ford, which designed the Vehicles and knew of the Defect, has been unjustly enriched through its sales of the Vehicles to unsuspecting persons in the Class.

**Sixth Cause Of Action**
**<u>Common Law Fraud</u>**
On behalf of Plaintiff and the Putative Class

130.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

131.    When Ford sold the Vehicles to Plaintiff and the putative Class Members it knew, or was reckless in not knowing, that the Vehicles contained a material safety Defect.  When Ford discovered the Defect, it continued to falsely misrepresent that its Vehicles were safe, despite being aware of the material safety Defect contained in the Vehicles' exhaust systems, and even issued TSBs which purported to address any problems with the Defect, but would in reality not repair the Defect at all.

132.    Plaintiff and the Class were unaware of the fact that the Vehicles had the Defect. Rather, Plaintiff and that putative Class Members would be reasonable in relying on Ford's representations of the Vehicles' safety, and purchased the Vehicles believing them to be safe.

133.    Plaintiff and the Class reasonably relied on Ford's material misrepresentations regarding the safety of the Vehicles.

134.    Plaintiff and the Class have been proximately damaged as a result of their reliance on Ford's misrepresentations in that they purchased Vehicles believing them to be safe when, in fact, they are not.

135.    The safety of the Vehicles is a primary selling point to Plaintiff and the Class. Had Plaintiff and the Class Members known that the Vehicles were not safe to drive, they would not have purchased them.

136.    Ford fraudulently concealed from and/or intentionally failed to disclose to Plaintiff, the Class, and all others in the chain of distribution (e.g., concealments and omissions in Ford's communications with wholesalers, retailers, and others in the chain of distribution that were ultimately passed on to Plaintiff and the Class) the true nature of the Vehicles, which is that they contain the Defect.

137.    Ford had a duty to disclose material facts regarding the true nature of the Vehicles because:

      a.  Ford had exclusive knowledge of the true properties of the Vehicles at the time of sale;

      b.  The Defect is not something that Plaintiff or Class Members could, in the exercise of reasonable diligence, have discovered independently prior to purchase;

      c.  Ford undertook active steps to conceal material facts regarding the safety of the Vehicles.  Plaintiff is aware of nothing in any of Ford's advertising, publicity, or marketing materials that discloses the truth about the Defect in the Vehicles, despite ample evidence that Ford was aware of the problem by virtue of, if nothing else, numerous consumer complaints; and

      d.  Ford made and continues to make partial representations about the Vehicles through its TSBs but also suppresses material facts. These partial representations

give rise to a duty to disclose the full story—that the Vehicles contain the Defect—despite Ford's promises to the contrary.

138.    The facts concealed and/or not disclosed by Ford to Plaintiff and Class Members are material facts in that a reasonable person would have considered them important in deciding whether to purchase an affected Vehicle.

139.    Ford intentionally concealed and/or failed to disclose the fact that the Vehicles contain the Defect for the purpose of inducing Plaintiff and Class Members to purchase the Vehicles.

140.    Ford's conduct has been and is wanton and/or reckless and/or shows a reckless indifference to the interests of others. Ford has acted with malice by engaging in conduct that was and is intended by Ford to cause injury to the Plaintiff and Class Members.

141.    Plaintiff and the Class Members justifiably acted or relied to their detriment upon the concealed and/or non-disclosed facts as evidenced by their purchase of the Vehicles.

142.    Had Plaintiff and Class Members known that the Vehicles contained the Defect, they would not have purchased an affected Vehicle.

143.    As a direct and proximate cause of Ford's misconduct, Plaintiff and Class Members have suffered actual damages in that they bought and own Vehicles that do not perform as promised, did not receive the benefit of their bargain, and are now left with Vehicles with reduced and diminished value in the marketplace.

144.    Plaintiff, on behalf of himself and all others similarly situated, demands judgment against Ford for actual and punitive damages for themselves and each member of the Class, plus attorneys' fees for the establishment of a common fund, interest, and costs.

**Seventh Cause of Action**

32

**Declaratory and/or Injunctive Relief**
On behalf of Plaintiff and the Putative Class

145.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

146.    An actual controversy exists between Defendant and Plaintiff concerning:

a.    Whether Defendant designed, manufactured and sold Vehicles with defective exhaust systems;

b.    Whether the Vehicles are unfit for their ordinary purpose of providing transportation;

c.    Whether the Vehicles are unfit for their particular purpose of providing safe transportation for adults and children;

d.    When Defendant discovered that the Vehicles were defective;

e.    Whether the Defect is a material safety Defect;

f.    Whether Defendant was unjustly enriched by the sale of the Vehicles;

g.    Whether Defendant breached its express and implied warranties;

h.    Whether Defendant's purported express warranty limitations regarding available remedies are unconscionable and void;

i.    Whether Defendant engaged in fraudulent, unfair, or deceptive conduct with respect to the handling of warranty claims;

j.    Whether members of the proposed Class have sustained damages and, if so, the proper measure of such damages; and

k.    Whether Defendant should be declared financially responsible for notifying all Class Members about the danger associated with the Defect and for all damages associated with the purchase and attempted repair of the Vehicles.

147.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  The declaratory relief sought here does not fall within any of the exemptions set forth in that Act.

148.    Accordingly, Plaintiff prays this Court declare that:

a.  The Vehicles have a material safety Defect which renders them unfit for their normal use;

b.  Ford knew and/or should have known that the Vehicles are defective, which would cause consumers to suffer damages;

c.  Ford is required to disclose to consumers, at its own cost, that the Vehicles have a Defect which carries a serious safety risk;

d.  Ford's express warranty fails its essential purpose and purported warranty limitations are void and unconscionable as a matter of law; and

e.  Ford is required to review and re-audit all prior warranty claims, including claims previously denied in whole or in part.

149.    The requested declaratory relief will generate common answers that will resolve controversies that lie at the heart of this litigation and will allow Plaintiff to obtain relief that directly redresses the injury suffered. Resolving these issues in this class action will eliminate the need for continued and repeated litigation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays that the Court enter judgment against Ford, and in favor of Plaintiff and the Class Members, and to award the following relief:

A.      Certify the proposed Class under Rule 23(b)(2), Rule 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure and appointment of Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Determine that Ford's conduct as alleged herein is unlawful, unfair, and/or deceptive and otherwise in violation of law;

C.      Enjoin any such future conduct by Ford;

D.      Award Plaintiff and the Class Members actual, compensatory, and/or statutory damages, as proven at trial;

E.      Award Plaintiff and the Class Members exemplary damages in such amount as proven;

F.      Award damages and other remedies, including, but not limited to, restitution and statutory penalties, as allowed by any applicable law, such as the consumer laws of Illinois;

G.      Award Plaintiff and the Class Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

H.      Award Plaintiff and the Class Members such other further and different relief as the case may require or as determined to be just, equitable and proper by this Court.

## **JURY DEMAND**

Plaintiff, on behalf of himself and all similarly situated persons, demands a trial by jury on all issues that are triable to a jury.

Dated: January 18, 2016

/s/ Edward A. Wallace
Edward A. Wallace
eaw@wexlerwallace.com
Amy E. Keller
aek@wexlerwallace.com
Adam Prom

35

ap@wexlerwallace.com
**WEXLER WALLACE LLP**
55 West Monroe St.
Ste. 3300
Chicago, Illinois 60603
Telephone: 312.346.2222
Facsimile: 312.346.0022

William M. Audet
waudet@audetlaw.com
Steven R. Weinmann
sweinmann@audetlaw.com
Joshua C. Ezrin
jezrin@audetlaw.com
**AUDET & PARTNERS, LLP**
711 Van Ness, Suite 500
San Francisco, CA 94102
Telephone: 415.982.1776
Facsimile: 415.576.1776

*Attorneys for Plaintiff and the Putative Class*