**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DAVID SCHIESSER, on behalf of himself and all others similarly situated, | Case No: 16-cv-00730 |
| Plaintiff, | Hon. John W. Darrah |
| vs. | |
| FORD MOTOR COMPANY, | JURY TRIAL DEMANDED |
| Defendant | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiff David Schiesser brings this action on behalf of himself and all others similarly situated against Defendant Ford Motor Company, stating as follows, upon information and belief, except as to the facts pertaining to him which are based on personal knowledge:

### I. INTRODUCTION

1. This case concerns the sale of certain Ford Vehicles[1] which have a material safety defect involving their exhaust system. The Vehicles as sold to Plaintiff and the putative Class Members contain a defect (the "Defect") that allows harmful and potentially lethal exhaust gases into the passenger compartment of certain models of Ford Vehicles. Ford is aware of the problem, and has issued a service bulletin, but the proposed fix is ineffective and Ford as yet has failed to notify the owners or prospective purchasers of a solution to the problem.

2. Because of the Defect, the Vehicles will be less desirable both to their current owners, who would not have purchased them had the truth been told, and will also be worth less

---

[1] "Vehicles" refers to 2011-2015 model year Ford Explorer vehicles.

in the secondary market. Current owners are rightfully reluctant to use and enjoy their Vehicles, as the Defect exists at the point of sale of the Vehicles and they have no way of knowing when the Defect might cause an accident or other personal harm.

## II.      PARTIES

3.      Plaintiff David Schiesser ("Plaintiff") is and was at all relevant times a resident of Orland Park, Illinois, and a citizen of the State of Illinois.

4.      Defendant Ford Motor Company ("Ford" or "Defendant") is the second-largest domestic automobile manufacturer and fifth-largest in the world as of 2010, and is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan. Ford is duly qualified and licensed to do business in the State of Illinois, and in fact does business in all 50 states (including also the District of Columbia).

## III.      JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy in this class action exceeds $5,000,000, exclusive of interest and costs, and some members of the Class, including Plaintiff, are citizens of states other than the states in which Ford is incorporated and has its principal places of business.

6.      This Court has personal jurisdiction over Ford because it is duly qualified and licensed to do business and in fact does substantial business in the State of Illinois.

7.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Additionally, Ford has operations and sales in this District.

2

## IV.  FACTUAL ALLEGATIONS

8.     This case arises from Ford's sale and lease of thousands of Explorer model Vehicles that Ford knew or should have known are dangerous and defective.  The exhaust systems of these Vehicles are defectively designed in such a way that they may let exhaust and other gases, including carbon monoxide (which is lethal), enter the passenger compartments of the Vehicles.  The potential exposure to carbon monoxide renders these Vehicles unsafe to drive.

9.     Ford began issuing Technical Service Bulletins acknowledging exhaust odor in the cabins of some of its vehicles in December 2012; however, it did not disclose those TSBs to its customers, and instead chose to conceal the Defect.

10.     Ford's Technical Service Bulletin 12-12-4 titled "Explorer Exhaust Odor in Vehicle," acknowledges that "[s]ome 2011-2013 Explorer vehicles may exhibit an exhaust odor in the vehicle with the auxiliary climate control system on.  Customers may indicate the odor smells like sulfur." Ford's TSB 12-12-4 provides instructions that Ford claims will correct the exhaust odor in 2011 through 2013 model year Ford Explorers.  This TSB was misleading in that it characterizes the defect as simply an unpleasant odor.  In reality, the exhaust that seeps into the cabins of the Vehicles contains deadly carbon monoxide, an odorless, colorless gas that is also a component of the gasses emitted from the vehicles' engines.

11.     Subsequent to TSB 12-12-4, Ford issued Technical Service Bulletin 14-0130 ("TSB 14-0130").

12.     Titled "Exhaust Odor in Vehicle," TSB 14-0130 also acknowledges an exhaust odor in Explorer vehicles, and adds the 2014 and 2015 model year Explorers to the list of affected vehicles.  TSB 14-0130 includes the same or similar service procedures outlined in

TSB 12-12-4, and adds certain procedures not included in TSB 12-12-4. This TSB was misleading in that it characterizes the defect as simply an unpleasant odor. In reality, the exhaust that seeps into the cabins of the Vehicles contains deadly carbon monoxide, an odorless, colorless gas that is also a component of the gasses emitted from the vehicles' engines.

13.     Ford's TSBs 12-12-4 and 14-0130, however, do not correct the condition, and they fail to acknowledge that carbon monoxide may enter the passenger compartment of affected vehicles. Ford's TSBs 12-12-4 and 14-0130 are provided to authorized dealerships, but do not directly notify non-Ford automotive repair facilities about the defects associated with TSBs 12-12-4 and 14-0130. Further, although Ford has received numerous complaints relating to exhaust entering the passenger compartments of 2011 through 2015 model year Ford Explorers, and it developed a purported fix to the problem, Ford provided no notice to plaintiff or the proposed Class Members about the Defect and the potential exposure to lethal carbon monoxide in 2011 through 2015 model year Ford Explorers.

14.     Upon information and belief, Ford sold or leased hundreds of thousands of defective Vehicles in Illinois. Each such vehicle was sold or leased in a dangerous and defective condition because each such vehicle contains design flaws, and/or an exhaust and/or HVAC system that permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment during the normal and customary use of such Vehicles.

15.     Carbon monoxide is a colorless, odorless, and tasteless gas that is toxic to humans, and deadly if ingested in high concentrations.

16.     Ford designed, manufactured, sold, and leased the 2011 through 2015 model year Ford Explorers when it knew or should have known of such defects, and failed to notify Plaintiff and the proposed Class Members of the Defect that exposed them to a material safety hazard.

4

17. Ford has also discovered that its model years 2011-2013 Ford Edge and Lincoln MKX vehicles (also manufactured by Ford) with 3.5L and 3.7L TIVCT engines exhibit the same condition for the same reason as the Explorer. Ford has prepared, though has not released, TSBs that describe the exhaust problem with these vehicles. Those vehicles are not the subject of this lawsuit.

18. The Defect as described herein is substantially similar across all Vehicles with regard to design, engineering, manufacturing, and testing. The Vehicles were designed, engineered, and manufactured by Ford with design flaws and/or defective exhaust and/or HVAC systems that permit carbon monoxide and exhaust to enter into the passenger compartments of those Vehicles while being driven in a normal and customary manner.

19. Ford designed, manufactured, assembled, inspected, distributed, sold, and leased the Vehicles in a manner so as to render the Vehicles defective and unsafe for their intended use and purpose by, among other things:

  a. Designing the Vehicles such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of the Vehicles;

  b. Designing the bumpers and/or tailpipes on the Vehicles such that exhaust and other gases, including carbon monoxide, may accumulate behind the bumper and within the interior and exterior panels, allowing those gases to permeate the passenger compartments of the Vehicles;

  c. Designing, manufacturing, and assembling the Vehicles using defective rear air extractors which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the Vehicles;

5

    d.  Designing, manufacturing, and assembling the liftgates in the rear of the Vehicles using defective drain valves, which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the Vehicles;

    e.  Designing, manufacturing, and assembling the Vehicles with sheet metal panels and overlaps which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the Vehicles;

    f.  Designing, manufacturing, and assembling the Vehicles with joints and seams which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the Vehicles; and,

    g.  Designing, manufacturing, and assembling the Vehicles with rear auxiliary air conditioning system parts which are defectively designed and/or located too close in proximity to the driver side rear air extractor, such that exhaust and other gases, including carbon monoxide, may enter the auxiliary air conditioning system and the passenger compartments of the Vehicles.

20.    Ford knew or should have known that the Vehicles were dangerous and defective such that drivers and passengers of those Vehicles may be exposed to carbon monoxide and other dangerous gases while the Vehicles are in operation.

21.    The defective Vehicles were sold or leased pursuant to express warranties. These warranties assured consumers that the Vehicles were free from defects and were properly equipped for the use for which they were intended. At the time the defective Vehicles were sold or leased by Ford directly and through its authorized agents, the Vehicles were in violation of express warranties. All of the defective Vehicles are still within the dates of the express written

warranties, or the time or mileage limits in the express warranties should be inapplicable given Ford's fraudulent conduct, among other things.

22.    In promoting, selling and repairing its defective Vehicles, Ford acts through numerous authorized dealers who act as Ford's agents, and who represent themselves to the public, as exclusive Ford representatives and agents.  That the dealers act as Ford's agents is demonstrated by the fact that: (i) the warranties provided by Ford for the defective Vehicles direct consumers to take their Vehicles to authorized dealerships for repairs or services (indeed, authorized Ford dealerships are instructed by Ford to address complaints of an exhaust odor by prescribing and implementing TSBs 12-12-4 and 14-0130); (ii) Ford dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers; (iii) Ford directs its authorized dealers as to the manner in which they can respond to complaints and inquiries concerning defective Vehicles; and (iv) Ford has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public.

### Ford Acknowledged the Problem and Worked to Fix it Years Ago

23.    Aside from the work Ford did to create the December 2012 TSB, Online discussion forum posts from Ford customers show that Ford had knowledge of this Defect, and had been attempting to remedy it years ago.

24.    For example, Ford demonstrated its knowledge of the Defect—which exists at the point of sale of the Vehicles—since at least 2011, when, in response to customer complaints of an exhaust odor in the passenger compartments of Ford Explorers, on July 25, 2011, at 1:46

pm, an "Official Ford Rep" offered to assist such customers "by escalating your concern and arranging for you to be called."[2]

25.     As further evidence of Ford's knowledge, the very next day, the "Official Ford Rep" responded to a customer post by confirming that he "received your [private message] and sent you a reply back.  In case you didn't check you inbox yet, please see my message for the details."

26.     Following additional complaints in the forum, on July 28, 2011, at 10:22 am, the "Official Ford Rep" said, "I mentioned this on the previous page and in case you may have missed it, I'm reaching out with an offer to help.  For those experiencing the burnt smell, if you haven't already done so, please [private message] me with your contact info, dealer, VIN, and mileage so I can escalate your concern."

27.     Several days later, a customer complained that "There is no way a smell as bad as this should be entering the passenger cabin of Ford's flagship SUV with the climate control set to recirculate.  If it's not a 'known' issue, then Ford needs to 'learn' about it.  There is a problem and they need to escalate this to a Ford engineer from Ford."  That very same day, the "Official Ford Rep" acknowledged the customer complaint by quoting it and said, "Thank you very much for the recommendations . . . I really appreciate it."  In the same post, the "Official Ford Rep" also "double checked" and "made sure" that a different customer would be called that day to discuss the smell and how she "had to [take] an additional [asthma] medication just to be able to drive [her] new [2011 Explorer]."

---

[2] *See* online posts from Ford Explorer forum named "Bad or Burnt smell during hard acceleration."  The Forum is described as "The Internet's #1 resource for Ford Explorer owners since 1996."  The posts from the "Official Ford Rep" can be identified by the username "FordService,"  *available at*: http://www.explorerforum.com/forums/showthread.php?t=323597 (last visited April 8, 2016).

28.    In October 2011, the "Official Ford Rep" addressed "those experiencing a smell" and offered several more times to help by "forwarding the details to the Customer Service Manager in your area."   Ford posted a similar message on December 13, 2011, at 12:39 pm following more complaints.

29.    Ford confirmed its knowledge of customer complaints on January 16, 2012, at 7:45 am when the "Official Ford Rep" acknowledged that Ford "monitor[s] these boards."

30.    On February 16, 2012, at 3:20 pm, the "Official Ford Rep" confirmed that Ford dealerships "have resources to find out [] information" regarding the problem.

31.    On February 28, 2012, at 10:43 am, the "Official Ford Rep" acknowledged: "We're working on a fix for this."

32.    Ford also responds to customer complaints via letter issued out of its Customer Service Division.  For example, on March 7, 2014, Ford wrote[3] to a customer:

> We thank you for taking the time to discuss the concern of exhaust odor in your vehicle.  To address your concern about exhaust odor, we have performed several inspections and sealing actions where applicable on your vehicle to help minimize the amount of odor coming into the passenger compartment.  With these changes you may still experience odor under certain driving conditions such as, when performing wide open throttle (WOT) accelerations with the climate control system in recirculation mode.

Upon information and belief, Ford sent similar form letters responding to customer complaints prior to March 7, 2014.   This communication was misleading in that it characterizes the defect as simply an unpleasant odor, when in reality the exhaust that seeps into the cabins of the Vehicles contains deadly carbon monoxide, an odorless, colorless gas that is also a component of the gasses emitted from the vehicles' engines.

---

[3] *See*  http://cd8ba0b44a15c10065fd-
24461f391e20b7336331d5789078af53.r23.cf1.rackcdn.com/edmunds.vanillaforums.com/editor/
03/vya24re2svv7.pdf (last visited April 8, 2016).

33.     The fact that carbon monoxide is one of the gasses entering the cabin has also been documented, including YouTube videos showing carbon monoxide being detected within the cabin of a 2014 Explorer even after the implementation of the TSB. *See* https://www.youtube.com/watch?v=z1KIBl6iX-E, uploaded by YouTube user "Explorer Driver" on October 22, 2014 (last accessed November 23, 2016), in which the owner of a 2014 Ford Explorer shows a carbon monoxide detector showing a reading of carbon monoxide of up to 11 parts per million. The description for the video reads as follows (emphasis added):

> My 2014 Ford Explorer with 5000 miles allows Carbon Monoxide CO to enter the cabin when the rpm's go over 4000. This happens on somewhat aggressive acceleration and even when the cruise control was set at 60 mph and I had to climb a long hill with 3 adults in the vehicle. The vehicle has the additional rear AC / Heat Option. This is easily repeatable by setting the main AC to MAX AC, recirculate, set digital thermostat to 70 degrees and set rear auxiliary AC to cold and medium fan speed. Start out with an aggressive acceleration until you reach about 60 and then let off the gas & coast a little. You don't even have to floor the accelerator. Then let vehicle slow down to 40 mph or so and hit the accelerator so it kicks down a gear or two to allow the rpm's to go up to at 4,000 rpm's & you will find yourself smelling a pretty strong odor of exhaust. I am just driving the vehicle the way someone might if they have to merge into traffic on the interstate and/or if they have to pass someone on the highway. I am not abusing the vehicle as I do these tests. If you're smelling exhaust, logic & physics tell us there is also CO in the air. I notice that the smell of exhaust goes down over time (or I get used to it), but the CO stays present until I roll down the windows. The professional grade CO Sensor I borrowed from a friend that owns a HVAC company confirms the presence of Carbon Monoxide. Ford sent their own Technician and stated they could not replicate. This video was taken after the Ford Technician checked out the vehicle and they denied my claim. Yes, I understand my daughter was with me, but I wanted to get this video made and have someone hold the sensor in the mid cabin to get a good middle reading of air. I now have to drive my vehicle with the windows down and do not let the rpm's get over 3,000 nor do I use the cruise control. **The first time the vehicle went into Ford service, they applied the TSB 14-0130.** The second time they had a Ford Technician brought in to test the vehicle. He said they did not find anything.

**Ford Acknowledged the Subject Vehicles' Defective Condition in TSBs 12-12-4 and 14-0130**

34.　　In response to customer complaints of an exhaust odor in the passenger compartments of Ford Explorers, Ford issued TSB 12-12-4 in or about December 2012. TSB 12-12-4 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2013 model year Ford Explorers.

35.　　In or about July 2014, Ford issued TSB 14-0130, which added 2014 and 2015 model year Explorers to the list of affected Vehicles. TSB 14-0130 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2015 model year Ford Explorers.

36.　　Despite issuing TSBs 12-12-4 and 14-0130, Ford did not inform Plaintiff or the members of the proposed Class of the Defect in 2011 through 2015 model year Ford Explorers, despite the fact that the Defect presented life safety issues to occupants of the Vehicles.

37.　　Notably, TSBs 12-12-4 and 14-0130 fail to disclose that the exhaust odor is accompanied in the passenger compartment by lethal carbon monoxide.

38.　　At all material times, Ford has failed to inform customers who purchased and/or leased 2011 through 2015 model year Ford Explorers that they are unsafe for operation or that they were designed, engineered, and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of such Vehicles.

39.　　In addition, TSBs 12-12-4 and 14-0130 do not identify a specific and effective fix to the exhaust odor problem. Rather, TSBs 12-12-4 and 14-0130 require various replacements and/or repairs to several unrelated vehicle parts. This demonstrates that Ford knew of the Defect, but did not know of a specific, effective fix to protect occupants of the 2011

through 2015 model year Ford Explorers from exhaust and other gases, including carbon monoxide. Based upon information and belief, Ford issued TSBs 12-12-4 and 14-0130 hoping to defuse or reduce the exhaust odor complaints from customers, while at the same time knowing that the instructions in the TSB would not completely remedy the Defect, or completely prevent exhaust fumes and carbon monoxide from entering the cabins of the Vehicles. Customers who have thus had the "repair" pursuant to the TSB have been placated into believing that their Vehicle is safe to drive, when, in fact, it is not.

**Ford's TSBs 12-12-4 and 14-0130 Fail to Repair the Defects**

40.     Ford's TSBs 12-12-4 and 14-0130 fail to repair the exhaust odor problem, and Vehicles which have received the repairs outlined in TSBs 12-12-4 and 14-0130 may continue to have exhaust and other gases—including carbon monoxide—enter the passenger compartment.

41.     TSBs 12-12-4 and 14-0130 identify flaws in the initial design and manufacture of the 2011 through 2015 model year Ford Explorer, and prescribe repairs and/or replacements which are inadequate and equally flawed and defective.

42.     In TSBs 12-12-4 and 14-0130, Ford requires installation or use of the following replacement parts in the Vehicles, among others: (i) a dual rate air extractor (part number BB5Z-61280B62-A under TSB 12-12-4 and part number BB5Z-61280B62-B under TSB 14-0130); (ii) valve assembly auto drains (part number 4M8Z-54280B62-A); and (iii) Motorcraft® Seam sealer (part number TA-2).

43.     TSBs 12-12-4 and 14-0130 require that the dual rate air extractor replace the driver side rear air extractor initially installed on the Ford Explorer. The rear air extractor initially installed was dangerous and defective because it permitted exhaust and other gases,

including carbon monoxide, to permeate the exterior panels of the Explorer Vehicles and enter the passenger compartment. Based upon information and belief, Ford requires the replacement of the driver side rear air extractor, and not the passenger side rear extractor, because the air intake from the auxiliary air conditioning system is situated dangerously close in proximity to the driver side rear air extractor. The placement of the air intake system too close to the rear air extractor allows exhaust and other gases, including carbon monoxide, to enter the auxiliary air condition system.

44.     The replacement part—a dual rate air extractor—is formed of polypropylene and overmolded with thermoplastic elastomer (TPE). The dual rate air extractor includes "living hinges" and plastic torsional springs that are meant to function as a one-way pneumatic valve.

45.     The dual rate air extractor has a listed purchase price of $86.33, whereas the initially-installed air extractor has a listed purchase price of $22.50. However, the dual rate air extractor fails to prevent exhaust and other gases, including carbon monoxide, from entering the auxiliary air condition systems and the passenger compartments of the Vehicles.

46.     This failure of TSB 12-12-4 has been documented by Explorer owners posting online, such as an online forum post entitled "Burning oil, aka 'Sulfur smell' TSB FAILED," first posting February 12, 2013, in the 'Stock 2011 - 2017 Ford Explorer Discussion' started by user gpzrider. http://www.explorerforum.com/forums/index.php?threads/burning-oil-aka-sulfur-smell-tsb-failed.379529/ (last accessed November 23, 2016). Numerous owners posting on the forum also confirmed that they had had the TSB implemented but most said that it had not worked. The replacement dual rate air extractors are therefore ineffective, dangerous and defective.

47.     In addition, Ford modifies the dual rate air extractors used as replacement parts per TSBs 12-12-4 and 14-0130 by haphazardly adding a silicone-like white substance to the uppermost of the three "living hinges."   Based upon information and belief, the silicone-like white substance found on replacement part number BB5Z-61280B62-A is not included, and was not meant to be included, as part of the dual rate air extractor as designed by its manufacturer. Moreover, the silicone-like white substance added by Ford to the dual rate air extractor causes the "living hinges" to remain open, permitting exhaust and other gases to permeate the exterior panels of the Vehicles, and enter the passenger compartment.

48.     Ford designed, manufactured and engineered the 2011 through 2015 model year Ford Explorers using valve assembly auto drains on the rear liftgate of the Vehicles which are dangerous and defective because the parts permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment. The replacement valve assembly auto drains fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment, and thus, they are ineffective, dangerous and defective.

49.     Ford designed, manufactured, engineered, and assembled the 2011 through 2015 model year Ford Explorers without properly sealing the horizontal sheet metal lap joints on the left and right sides of the underbody of the subject Vehicles. Ford additionally designed, manufactured, engineered, and assembled the 2011 through 2015 model year Ford Explorers without properly sealing the rear sheet metal overlap flange across the rear of the vehicle, and the auxiliary air conditioning lines.  Accordingly, TSBs 12-12-4 and 14-0130 require that the foregoing joints, flange and lines be sprayed with "generous amounts" of rubberized undercoating, and seam sealer.  However, the rubberized undercoating and seam sealer fail to

prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.[4]

50.     TSB 14-0130 additionally requires reprogramming the HVAC module; however, this reprogramming fails to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

### NHTSA Launches Investigation of Exhaust Leak Issue

51.     The National Highway Transportation Safety Administration, or NHTSA, on July 1, 2016 launched an investigation into the exhaust leak issue, including how some of the vehicle owners "expressed concerns about exposure to carbon monoxide." The summary also notes the existence of the two TSBs and that some owners had stated that they did not work (emphasis added):

> NHTSA has identified 154 complaints involving MY 2011 to 2015 Ford Explorers which report occupants smelling exhaust odors in the occupant compartment, some of which expressed concerns about exposure to carbon monoxide. There is one low speed crash incident (VOQ 10735818) alleged by a complainant, no injuries were reported. Complaints indicate that 1) operating the vehicle with full throttle applications (e.g., climbing steep grades or merging onto freeway ramps), and or 2) use of the air conditioning system in recirculation mode both contribute to exhaust gas being detected in the vehicle. Ford issued two related Technical Service Bulletins (TSB). Ford TSB 12-12-4 dated December 10, 2012, specified sealing and undercoating of certain areas of the rear floor pan and body seams, replacement of the left-side air extractor, and installation of rear lift gate drain valves. It was superseded by TSB 14-0130 dated July 22, 2014, which added additional software changes to the recirculation mode operation of the air conditioning system during full throttle application events. **Some vehicle owners reported little or no improvement after the TSB remedy. This investigation is opened to evaluate any potential driver related safety concerns caused by this issue.**

---

[4] Despite its "inspections and sealing actions," Ford admits that customers "may still experience odor under certain driving conditions such as, when performing wide open throttle (WOT) accelerations with the climate control system in recirculation mode." *See supra* fn. 3.

**Ford's Conduct and/or Inaction Has Damaged Plaintiff and Members of the Proposed Class**

52.     Plaintiff and each member of the proposed Class has been damaged by Ford's conduct and/or inaction, as they have been exposed to harmful carbon monoxide and exhaust, they unknowingly purchased defective Vehicles which cannot be safely operated, they have been forced to pay, or will pay, substantial amounts of money to repair the Vehicles, if a repair can be made, and the value of their Vehicles has been diminished because of the Defect.

53.     A vehicle containing the Defect described herein—that is, a Defect that permits the entry of carbon monoxide and other gases into the passenger compartment of the vehicle—is worth less than a vehicle free from such Defect.  The Defect represents a safety issue and a health hazard, and renders the Vehicles valueless.  At the time plaintiff purchased the vehicle, he paid a price based on the value of a vehicle free of such a Defect.

54.      Plaintiff brings this action individually and on behalf of all other current owners of the affected Vehicles. Plaintiff seeks damages, injunctive relief, and equitable relief for the conduct of Ford related to the Defect Fords alleged in this complaint.

**Plaintiff's Purchase of his Vehicle**

55.     Plaintiff Schiesser selected and ultimately purchased his vehicle, a model year 2013 Ford Explorer, based on Ford's reputation and in the belief that the Explorer was a safe vehicle, from Joe Rizza Ford in Orland Park, Illinois, in June of 2012.  At the time of Plaintiff's purchase of his Vehicle, Ford already knew of the Defect described herein, as it had received—and responded to—customer complaints surrounding the Defect.  Additionally, Ford had already begun testing and work to create a TSB that would address customer complaints concerning the Defect.  But Ford did not disclose this information to the public and did not disclose the danger

16

of the Defect to the Plaintiff prior to his purchase of the Vehicle. Rather, Ford intentionally concealed the Defect, and represented that its Vehicles were safe to drive.

56.     Ford's representations of vehicle safety were publicly-disclosed in Ford's 2011 annual report, William Clay Ford, Jr., Executive Chairman, represented that Ford produces the "best-in-class vehicles that lead in quality, fuel efficiency, safety, smart design and value." 2011 Annual Report, Ford Motor Co., *available at* https://corporate.ford.com/content/dam/corporate/en/investors/reports-and-filings/Annual%20Reports/2011-annual-report.pdf (last accessed April 10, 2016).

57.     Ford's website contained representations about the Vehicles' "Remote Start/Climate Control System" that did not include any warnings about how exhaust fumes or carbon monoxide could seep back into the Vehicles' cabins.

58.     Plaintiff was reasonable in relying on Ford to manufacture a vehicle that performed in a safe operation and was free from material safety defects. Plaintiff was also reasonable in expecting that Ford would repair any material safety Defects pursuant to the terms of the warranty it provided to owners and leasees of its vehicles.

59.     Plaintiff had no reason to believe that his Vehicle was Defective because Ford intentionally concealed the Defect and the dangerous nature of the Defect. In or about August or September of 2015, the Plaintiff began to notice exhaust fumes accumulating in the cabin of his Explorer. The smell was especially prevalent whenever the outside air vents were on and the vehicle came to a stop.

60.     Plaintiff brought the car in to a Ford dealer, Joe Rizza Ford in Orland Park, Illinois, for service in or around early October 2015, and asked them to fix the problem. Although the 2012 Ford Service Bulletin was not readily accessible to consumers, the Plaintiff

brought it to the attention to the dealership after he found a reference to it online. The service manager informed the Plaintiff that he had called Ford and they proposed two possible solutions—one that would cost $800, and one that would cost $900—but would not guarantee that either fix would work. Because neither "fix" was guaranteed to work, Plaintiff elected not to incur the cost of the repair.

61. The representations made by Ford contained neither a disclosure about the Defect nor did they inform the Plaintiff and putative Class Members that there was no fix to the Defect. To the contrary: Ford represented that its cars were safe and concealed the material safety defects from consumers by issuing technical service bulletins—as described herein—which masked the true nature of the safety Defect, and through its communications with consumers via public, online forums.

62. Plaintiff Schiesser was aware at the time of his purchase that his Explorer came with a factory warranty, and this fact was important to him in making the decision to purchase the vehicle. He would not have purchased the vehicle if he had been told that, as a new vehicle, it did not come with a factory warranty.

**Ford's New TSB and Proposed Nationwide Settlement**

63. Ford and the plaintiffs in another action, *Sanchez-Knutson v. Ford Motor Company*, No. 14-61344-CIV (S.D. Fla.), entered into a proposed nationwide settlement of claims which would encompass those in this complaint. A copy of the proposed Settlement, which was preliminarily approved on November 17, 2016, (*Sanchez-Knutson* ECF No. 418) is attached as Exhibit A hereto. The proposed relief in the *Sanchez-Knutson* settlement consists of only a "new" Technical Service Bulletin "fix" consisting of efforts to "recalibrate" the air conditioning system and "seal" the exhaust system. Stipulation and Agreement of Settlement,

18

ECF No. 418 at Section I. (p) (hereafter, "SA"). If that first fix "fails" on selected vehicles, then there is a second aspect of the TSB that re-routes the exhaust. *Id*. However, the second or more complete part of the remedy—consisting of vaguely described "additional services . . . including installation of a modified exhaust system," is only offered to those who have had first attempted repair / fix performed *under warranty*, if they have service records  and if the fix is deemed to have failed *by Ford and its authorized dealer*. SA Section II (b). This Technical Service Bulletin (or "TSB") has not even been issued yet, as the agreement says Ford "will" issue it "in 2016." *Id*. The new TSB is described as:

### p. **New Exhaust Odor TSB**

"New Exhaust Oder TSB" means a Technical Service Bulletin ("TSB") that Ford will issue in 2016 describing updated procedures to address Exhaust Odor in the Class Vehicles. The TSB may include two phases of service: (1) air conditioning system recalibration and sealing of gaps in the passenger compartment; and (2) if Ford and its Authorized Ford Dealer determines that phase (1) did not eliminate the Exhaust Odor in vehicles equipped with a normally aspirated 3.5 liter Twin Independent Variable Camshaft Timing ("TiVCT") engine, additional services will be performed, including installation of a modified exhaust system.

*Sanchez-Knutson* SA, Exhibit A at 7.

64.     The existence of the proposed settlement in the *Sanchez-Knutson* case, and its proposed future TSB(s) further confirm that the previous TSBs did not resolve the Defect, and that Ford has been representing that the Explorer was not defective.  Ford, as it has in the Settlement Agreement in *Sanchez-Knutson*, will continue to publicly represent that there is no problem with the vehicles while at the same time, issuing TSBs that are an acknowledgement that there is a problem that has not yet been fixed.   Plaintiff therefore seeks an injunction to stop Ford from continuing to make false representations about the safety of the vehicles.

65.     The language in the SA and in the proposed Notice in the *Sanchez-Knutson* settlement is a further indication of the problem. Ford insists upon characterizing the defect as an "Exhaust Odor" issue. A copy of the Notice is Exhibit B hereto. In the Notice, the term "Exhaust Odor" is used 21 times. The use of these terms in the TSBs and in future statements by Ford to Plaintiff and the owners of the affected vehicles will mislead the owners into believing that there is only a viscerally unpleasant aspect to the exhaust leak. This characterization, however, is misleading because deadly carbon monoxide, an odorless, colorless gas is also a component of the gasses emitted from the vehicles' engines. Thus, no reasonable person informed of the TSBs, the proposed Settlement in *Sanchez-Knutson*, or future statements by Ford regarding the "Exhaust Odor" issue will be on notice of the extent of the Defect, and in fact, may be lulled into believing that if they don't smell anything, there is no problem at all. An injunction is necessary to stop Ford from continuing to issue TSBs or making other public statements that mischaracterize the exhaust leak as simply an "exhaust odor" problem.

66.     The nature of the "exhaust" repair being offered to Explorer owners recently, as related by owners who have had the fix done in online postings and otherwise, which may be the one Ford is peddling in the *Sanchez-Knutson* settlement, consists (at least in part) of simply cutting a hole in the bottom of the exhaust tip extender past the muffler, and plugging up the end, while possibly also replacing the existing tip with a redesigned tip with a larger diameter, but also with now a "fake" exit for the exhaust gasses out the rear and the actual exit being a hole in the bottom of the exhaust tip.[5] This exhaust fix presents additional issues, as it vents the

---

[5] Ford Explorer Forum, http://www.explorerforum.com/forums/index.php?threads/bad-or-burnt-exhaust-smell-in-cabin-during-acceleration.323597/page-85.

gas straight down under the vehicle rather than to the rear, which would substantially increase the amount of exhaust gasses that will be directed back into a garage if a vehicle is being "warmed up" before being pulled out. This overly simplistic and possibly dangerous fix thus may well cause more problems than it solves.

67.     The District Court in the *Sanchez-Knutson* case found in certifying a class, that "Plaintiff in this action has presented the Court with substantial evidence that the exhaust contamination is a systemic problem, caused by a combination of design and manufacturing defects." *Sanchez-Knutson* ECF 148.

68.     Plaintiff and putative Class Members have suffered ascertainable losses as a result of Ford's omissions and/or misrepresentations associated with their Vehicles in the form of diminished value of their Vehicles and loss of use. Had Plaintiff known of the presence of the problem, he would not have purchased his vehicle.

69.     As a result of having received notification of the problem, Plaintiff, like the other Class Members, is reluctant to drive and enjoy his vehicle. The risk of having an exhaust gas leak that could cause serious physical harm from inhalation makes the Vehicles unreasonably dangerous and unfit for safe operation.

70.     Plaintiff and putative Class Members would not have purchased their Vehicles or would have paid far less for them had they known of the presence of the Defect. Further, they have all suffered loss of use and reduced resale value as a result of the existence of the Defect which has now—after their Vehicles were purchased—been made public knowledge.

71.     Ford's New Vehicle Limited Warranty, applicable to all Ford Explorers, states that "if: - your Ford vehicle is properly operated and maintained, and - was taken to a Ford dealership for a warranted repair during the warranty period, then authorized Ford Motor

21

Company dealers will, without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship." The remedy under this written warranty is purported to be "limited to repair, replacement, or adjustment of defective parts;" and the duration of any implied warranty "including the implied warranty of merchantability and fitness for a particular purpose, are limited to the duration of the original warranty."

### Ford's Warranty is Procedurally and Substantively Unconscionable and Fails of its Essential Purpose

72. All of new Ford vehicles come with a warranty that provides "bumper to bumper" coverage for three years, or 36,000 miles. Ford states that its warranty "is limited to repair, replacement, or adjustment of defective parts. This exclusive remedy shall not be deemed to have failed its essential purpose so long as Ford, through its authorized dealers, is willing and able to repair, replace, or adjust defective parts in the prescribed manner."

73. But Ford knows that when it sells the Vehicles, they contain defects at the point of sale. Specifically, a Defect as described herein allows dangerous carbon monoxide fumes to enter the passenger compartments of the Class Vehicles. Customers, like Plaintiff Schiesser who began to notice exhaust fumes accumulating in the cabin of his Explorer more than three years after he purchased the Vehicle, may not know of the Defect until after the warranty expires, as certain driving conditions make the Defect more obvious than others. Ford's position is that customers who complain about the Defect after the warranty period expires are not entitled to have their Vehicles fixed despite the Defect existing at the point of sale of all Class Vehicles.

74.     Ford offers its warranty to consumers on a "take it or leave it" basis and does not allow individuals to negotiate the terms of the warranty.  Ford did not allow Plaintiff to negotiate the terms of the warranty provided on his Vehicle.

75.     At all times relevant, Ford is and was a merchant in the business of manufacturing, marketing, and selling vehicles.  Further, Ford knew or should have known that the exhaust systems were defective and would necessitate extra costs for labor, parts, and consequential and incidental damages.  Ford's internal testing systems likely showed the Vehicles' Defect since before the first Vehicles were sold in 2010, and Ford had notice of complaints, as described herein, prior to the issuance of the TSB, which demonstrated that purchasers of the Vehicles were incurring such costs and damages due to the Defect, and prior to Plaintiff's purchase of his Vehicle.

76.     Plaintiff, by contrast, is not an expert in manufacturing vehicles and did not know about the Vehicles' Defects.  At the time the Plaintiff purchased his Vehicle, he expected it to perform as marketed and to not potentially cause him harm.

77.     The time and mileage limitations of three years or 36,000 miles, as well as the other warranty limitations, are unconscionable under Uniform Commercial Code ("UCC") § 2-302, as adopted by the Illinois in 810 ILCS 5/2-302, and thus do not otherwise prohibit Plaintiff and the Class from obtaining appropriate relief.

78.     Ford had knowledge that drivers of these vehicles were noticing the defect within and outside of the warranty period.  But whether or not  drivers experienced the defect within the warranty period had no impact on whether Ford actually fixed the problem: the service bulletins fail to address the problem, and even if the service bulletins *did* address the issue, Ford didn't perform the repairs.  For example, in a lawsuit filed against Ford in the United States

District Court for the Southern District of Ohio, *Bruzina v. Ford Motor Company*, No. 16-cv-797, the plaintiff complained of exhaust odor at 26,934 miles. But the authorized Ford representative only changed an air filter in the vehicle because "it claimed that the problem had not been duplicated." *Bruzina* ECF No. 1 ¶ 21. In another lawsuit, filed in the United States District Court for the Southern District of California, *Cunningham, et al. v. Ford Motor Company, et al.*, No. 15-cv-00124, one of the plaintiffs first discovered the presence of exhaust in the passenger cabin of the vehicle within 2,700 miles. When the plaintiff informed Ford about the odor, the service representative told the plaintiff "that his experience was the result of the vehicle being new, and that it would fix itself by about 5,000 miles." *Cunningham*, ECF No. 35 at ¶ 35. The plaintiff continued to experience the problem, repeatedly complained to Ford up to when the vehicle had 25,930 miles on it, and Ford failed to fix the Defect. *Id.* at ¶¶ 36-38.

79.     Ford knew that some customers would not notice the Defect until Vehicles had tens of thousands of miles on them and/or after the warranty period expired, yet concealed the Defect so that it would not have to repair many of the putative Class Members' Vehicles. Had Ford disclosed the Defect and the dangerous nature of the Defect to its customers, it would have had to repair the Vehicles immediately. By not disclosing the safety Defect, Ford was able to reap profit from the sale and lease of the Vehicles while at the same time not bearing the cost of fixing them.

80.     Ford knew of the Defect prior to the sale or lease of the Vehicles and that the Defect had the potential to manifest within and after the warranty period. Any limitation period in Ford's warranty was thus unconscionable, as Ford knew that some consumers may not have been able to detect the Defect until the warranty period expired.

81.     Further, the remedies provided by Ford did not resolve the Defects, and consumers who attempted to make warranty claims were unable to have their vehicles repaired. As a result, Ford's warranty failed of its essential purpose.

## V.     CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action on behalf of himself and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following defined Class (the Class"):

> All persons who purchased or leased in the State of Illinois, 2011, 2012, 2013, 2014, or 2015 model year Ford Explorer Vehicles.

The claims brought for the Class do not include any claims for personal injury, or for property damage outside of the damage to other parts of the Vehicles themselves caused by defects in the exhaust system.

83.     Members of the Class are ascertainable based upon the objective criteria as outlined herein.

84.     Specifically excluded from the Class above are: (a) all federal court judges who preside over this case and their spouses; (b) all persons who elect to exclude themselves from the Class; and (c) Ford's employees, officers, directors, agents, and representatives and their immediate family members. Also excluded from the Class are Ford and its subsidiaries and affiliates; and governmental entities. Plaintiff reserves the right to revise the Class definition based upon information learned through discovery.

85.     Class Members seek relief under both Rule 23(b)(2) and Rule 23 (b)(3), as well as certification of a class as to issues affecting the Class under Rule 23(c)(4) of the Federal Rules of Civil Procedure. Specifically, under Rule 23(b)(2), Class Members seek to have the

Court declare any limits on full recovery by the Class Members contained in the warranties to be unenforceable and otherwise null and void. This relief is based solely upon Ford's past and current systematic practices and policy of limiting remedies of the Class Members, and thus declaratory relief is thus appropriate for the Class as whole.

86.     Under Rule 23(b)(3), various common issues of fact and law as to Defendant's actions and the relief to which Plaintiff and the Class are entitled are common to all and predominate over any common issues as set forth below.  Under Rule 23(c)(4), the common issues of the existence of the Defect and the proper interpretation of the warranty terms are also appropriate for certification as issues affecting all Class Members.

### A.     Numerosity

87.     The Class is composed of thousands of owners of Vehicles, making joinder impracticable.  The disposition of their claims in a single class action will provide substantial benefits to all parties and to the Court.

### B.     Typicality

88.     There is a well-defined community of interest among the Class Members. Plaintiff's claims are typical of the Class Members' claims in that the representative Plaintiff, like all Class Members, owns one of the Vehicles manufactured, marketed, and sold by Ford. Plaintiff, like all Class Members, has been damaged by Ford's misconduct. The factual basis of Ford's misconduct is common to all Class Members and represents a common thread of misconduct and/or acts and/or omissions resulting in similar injuries to all Class Members.

### C.     Commonality

89.     There are common questions of law and fact making this action appropriate for class action treatment. Some of the common questions include:

26

a. Whether Ford fraudulently concealed from and/or failed to disclose to the Plaintiff and Class Members the existence of the Defect;

b. Whether Ford's conduct in selling and marketing the listed Vehicles was negligent, wanton, or willful;

c. Whether Ford breached its express warranty to Plaintiff and Class Members;

d. Whether the performance of the listed Vehicles is not as advertised and/or promoted by Ford;

e. Whether the Plaintiff and the Class Members are entitled to damages and the amount of such damages;

f. Whether the Plaintiff and the Class Members are threatened with irreparable harm and whether they are entitled to injunctive and/or other equitable relief, including requiring Ford to reimburse the Class, and buy back and/or replace the Vehicles.

g. Whether each Vehicle is defective such that carbon monoxide and exhaust may enter the passenger compartments of such Vehicles; whether the Vehicles suffer from a Defect, are unreasonable dangerous and/or are unfit for their intended use;

h. Whether Ford has knowledge of the Defect;

i. When Ford learned of the Defect;

j. Whether Ford misrepresented that the Vehicles were safe;

k. Whether Ford has a fix to the Defect and, if so, how much the fix will cost;

l. Whether the Defect reduces the value of the affected Vehicles;

m. Whether Ford's express warranties cover the Defect;

n. Whether Ford negligently designed/engineered/manufactured the affected Vehicles; and

o. Whether plaintiff and the Class have suffered damages as a result of the conduct alleged, and if so, the measure of such damage.

**D.    Adequacy of Representation**

90.    Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained the undersigned counsel, with substantial experience in prosecuting class actions. Plaintiff and his counsel are committed to prosecuting this case vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have any interests adverse to those of the Class.

**E.    Superiority and Manageability**

91.    A class action is superior to other methods for the fair and efficient adjudication of the subject controversy. Absent a class action, most Class Members will likely find the cost of litigating their individual claims to be prohibitive, and will have no effective remedy at all. Because of the relatively small size of the individual Class Members' claims, few Class Members could likely afford to seek legal redress for Ford's misconduct. Absent a class action, Class Members will continue to incur damages and be at risk of irreparable harm while Ford's misconduct will proceed without remedy.

92.    The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and litigants, and promotes consistency and efficiency of adjudication. Additionally, Ford engaged in the same or similar misconduct towards the Plaintiff and Class Members, thus

requiring court imposition of uniform relief to insure compatible standards of conduct toward the Class as a whole.

## VI.     TOLLING OF STATUTE OF LIMITATIONS

93.     All limitations periods were tolled by the doctrines of fraudulent concealment, the discovery rule, and/or equitable tolling. As alleged herein, Ford wrongfully concealed the facts relating to the claims alleged.  Plaintiff and Class Members did not discover the operative facts that are the basis of their claims because they were concealed from the public, including Plaintiff and the Class Members, by Ford. No amount of diligence by Plaintiff or Class Members could have led to discovery of these facts because they were kept secret by Ford and, therefore, Plaintiff and Class Members were not at fault for failing to discover these facts, nor did they have actual or presumptive knowledge of facts sufficient to put them on inquiry.

94.     Class Members had no way of knowing about Ford's deception with respect to the Defect.

95.     Ford's TSBs acted to conceal the existence of further problems which would not be cured by the implementation of their suggested solutions.

## VII.     Causes of Action

### First Cause of Action
### Breach Of Express Warranty
On behalf of Plaintiff and the Putative Class

96.     Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

97.     When plaintiff and members of the Class purchased and/or leased their Vehicles, Ford expressly warranted that the Vehicles would be free from defects in design, materials and workmanship.  Ford promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

98.     Ford also specifically represented to the public that its vehicles were safe.

99.     When plaintiff and members of the Class purchased and/or leased the Vehicles, Ford warranted that the Vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a safe and non-defective condition for use by owners and lessees, and were not otherwise injurious to consumers.  Ford was under a duty to design, construct, manufacture, inspect and test the Vehicles so as to make them suitable for the ordinary purpose of their use.

100.     The Vehicles contain a Defect which exist at the point of sale, which should be repaired pursuant to the warranty offered by Ford.  Ford, however, does not tell consumers of the existence of the Defect, and instead requires its consumers to first notice the Defect and complain in order to seek service.

101.     The Vehicles described above share a common Defect in the way their exhaust systems were designed and/or manufactured.  The exhaust systems were defectively designed so that they allow exhaust and other gases, including carbon monoxide, to enter the passenger compartment of the Vehicles during their normal and customary use.  Ford is aware of the Defect, and has acknowledged the problem of an exhaust odor inside the passenger compartment of certain Vehicles by its issuance of TSBs 12-12-4 and 14-0130.  However, TSBs 12-12-4 and 14-0130 do not disclose the presence of carbon monoxide inside the passenger compartment of the Vehicles, nor do they fix the problem of exhaust and other gases entering the passenger compartment.

102.     Ford has breached its express warranty by failing to disclose a safety Defect in the Vehicles, by failing to fix the Defect in the Vehicles, and by selling or leasing Vehicles which are unsafe and unfit for the ordinary purposes for which they are intended to be used.

103.    Ford further breaches its warranties to consumers by offering a fix that neither addresses nor fixes the Defect in the Vehicles.

104.    Plaintiff and each of the members of the Class have had sufficient direct dealings with either Ford or its agent dealerships to establish privity of contract between Ford, on the one hand, and Plaintiff and each of the members of the Class, on the other hand.  The warranty provided for the Vehicles is between Ford and the ultimate consumers of the Vehicles.  Ford is in privity of contract with the Class Members.  Ford's warranties were designed for and intended to benefit the consumers only.

105.    Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.  Ford has known, or should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the subject Vehicles' Defect resulting in exhaust and other gases, including carbon monoxide, entering the passenger compartment of such Vehicles.  Despite its knowledge, Ford has failed to disclose the existence of this Defect and the risk of carbon monoxide exposure, and has failed to rectify the situation.

106.    Plaintiff afforded Ford an opportunity to cure by bringing his vehicle into an authorized Ford dealership for service, and notifying the dealership of an exhaust odor in the passenger compartment.  Plaintiff was specifically informed by Ford's authorized dealer that Ford knows of the problem, and does not have a viable means to fix the problem.  Under the circumstances, any requirement that plaintiff afford Ford an additional opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

107.    Ford's customers expect that Ford's warranty will cover repairs to dangerous defects existing within the Vehicles existing at the point of sale of the Vehicles.  Accordingly, such warranties are part of the bargain between consumers and Ford.

31

108.    Ford breached this express warranty when it knew of the dangerous Defect existing in each of its Vehicles but failed to fix the Defect, and issued TSBs that failed to resolve the Defect.

109.    Ford has actual knowledge of the specific common Defect associated with the Vehicles and the problems resulting therefrom.

110.    Although Ford was on notice of the Defect, it continued to sell the Vehicles to Plaintiff and Class Members without disclosing the dangerous and material Defect.  Further, Ford knew that the limitations in its warranty periods—both in time and mileage—would inure to the benefit of Ford and to the detriment of Class Members, because many Class Members would not know of the Defect until after the limitations on the warranty period expired.  As a result of this, Ford sold and leased Vehicles to Class Members without disclosing the Defect, and represented the Vehicles as safe, while benefitting from a short warranty period to drive down the number of warranty claims it would have to pay on the material Defect.

111.    Some Class Members—like the Plaintiff—are beyond the mileage limitations as provided in the terms of the Vehicles' warranties.   But the warranty limitations are unconscionable because Ford knew of the Defect, but hid the Defect from consumers and even warranted and represented that the Vehicles were safe.  Thus, by the time consumers knew of the Defect, Ford has benefited from short warranty limitations in not having to cure the Defect as the Vehicles are out of warranty.  The defect is latent in that an owner may not engage in the type of driving that will bring the exhaust gas leak to his or her attention for many miles, or she or he may mistake the odor as having come from outside of the vehicle.  Thus, given Ford's failure to apprise anyone of the issue and its active statements to minimize the problem by calling it an "exhaust odor" problem, the warranty periods should have been extended.

32

112. Worse still, if Ford performed the work described in the TSBs under warranty, there is no guarantee that the repair would cure the Defect (indeed, it does not). Thus, Ford has lulled its consumers into believing that the TSB repairs have cured the Defect, when they have not, allowing the limitation periods in the warranty to run without repairing the Vehicles.

113. Ford's conduct is the direct and proximate cause of Plaintiff's and the Class Members' injuries.

114. Plaintiff, individually and on behalf of the other Class Members, seeks all damages permitted by law, including diminution in value of their Vehicles, loss of the benefit of the bargain, and/or out-of-pocket expenses in an amount to be proven at trial.

115. Plaintiff and the Class Members are entitled to legal and equitable relief against Ford, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

**Second Cause of Action**
**Magnuson-Moss Act—Express Warranties**
**15 U.S.C. §§ 2301, *et seq*.**
On behalf of Plaintiff and the Putative Class

116. Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

117. The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

118. Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express warranties.

119.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

120.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty

121.    Ford has breached these warranties as described herein. Without limitation, and as described herein, Ford's Vehicles are defective, which resulted in the problems and failures also described above.

122.    When Plaintiff and members of the Class purchased and/or leased their Vehicles, Ford expressly warranted that the Vehicles would be free from defects in design, materials, and workmanship.  Ford promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

123.    When plaintiff and members of the Class purchased and/or leased Ford Vehicles, warranted that the Vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used (including the guarantee that they were in a safe and non-defective condition for use by owners and lessees), and would not otherwise contain material safety defects.  Ford was under a duty to design, engineer, construct, manufacture, inspect, and test the Vehicles so as to make them suitable for the ordinary purpose of their use.

124.    The Vehicles described above share a common Defect existing at the point of sale of the Vehicles in that they have been designed and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartment of the Vehicles during their normal and customary use.  Ford is aware of the Defect, and has acknowledged the problem of an exhaust odor inside the passenger compartment of the Vehicles by its issuance of TSBs 12-12-4 and 14-0130 (and investigation related to similar problems with other vehicles),

and communications with Class Members. However, TSBs 12-12-4 and 14-0130 do not disclose the presence of carbon monoxide inside the passenger compartment of the Vehicles, nor do they fix the problem of exhaust and other gases entering the passenger compartment. Ford has breached its express warranties by failing to disclose a material safety Defect in the Vehicles, by failing to fix the Defect in the Vehicles, and by selling or leasing Vehicles which are unsafe and unfit for the ordinary purposes for which they are intended to be used.

125.    Ford knew of the Defect, yet continued to sell and lease Vehicles without attempting to adequately remedy the Defect, disclose the Defect, or determine how to fully fix the Defect. Worse still, the TSBs Ford developed to address the Defect lull consumers into a false sense of safety when, in fact, the TSBs do not fix the Defect, and allow dangerous fumes to enter the cabin.

126.    Ford knew that the limitations in its warranty periods would have the effect of ensuring that some Class Members do not receive the required repairs to their Vehicles. As described herein, those limitations are unconscionable.

127.    Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. Ford has known, should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the Vehicles' Defect resulting in exhaust and other gases, including carbon monoxide, entering the passenger compartment of such Vehicles. Notwithstanding, Ford has failed to disclose the existence of this Defect and the risk of carbon monoxide exposure, and has failed to rectify the situation.

128.    Plaintiff afforded Ford an opportunity to cure by bringing his vehicle into an authorized Ford dealership for service, and notifying the dealership of an exhaust odor in the passenger compartment. Plaintiff was specifically informed by Ford's authorized dealer that

Ford knows of the problem, and does not have a means to fix the problem. Rather than spend money out-of-pocket for a repair that was not guaranteed to work, Plaintiff elected not to pay for the work outlined in the TSBs. Under the circumstances, any requirement that plaintiff afford Ford an additional opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

129. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000.00, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

130. Plaintiff, individually and on behalf of the other Class Members, seeks all damages permitted by law, including diminution in value of their Vehicles, in an amount to be proven at trial.

131. By Ford's conduct as described herein, including Ford's knowledge of the Defect inherent in the Vehicles and its action, and inaction, in the face of the knowledge, including its concealment of the Defect and omission of the dangerous nature of the Defect, Ford has failed to comply with its obligations under its written promises, warranties, and representations.

132. In its capacity as a warrantor, and by the conduct described herein, any attempts by Ford to limit the warranties in a manner that would exclude coverage of the defective exhaust systems is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective exhaust systems is null and void.

133. All jurisdictional prerequisites have been satisfied.

134. Plaintiff and members of the Class are in privity with Ford as Ford's warranties were expressly written for the benefit of Plaintiff and Class Members as end users of the Vehicles. Ford's authorized dealers, franchisees, representatives, and agents, on the other hand,

were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided by Ford; these intermediary entities made no changes to Ford's Vehicles, nor made any additions to the warranties issued by Defendant. Further, Ford's applicable express warranties state that the warranties are made to the first purchaser and subsequent purchasers.

135.    As a result of Ford's breach of express warranties, Plaintiff and the Class Members are entitled to revoke their acceptance of the Vehicles, obtain damages and equitable relief, and obtain costs pursuant to 15 U.S.C. §2310.

**Third Cause Of Action**
**<u>Illinois Uniform Deceptive Trade Practices Act</u>**
**<u>815 ILCS 510/1</u>**
On behalf of Plaintiff and the Putative Class

136.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

137.    Under the Illinois Uniform Deceptive Trade Practice Act ("DTPA"), 815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation or occupation," the person does any of the following: (1) represents that goods or services have characteristics that they do not have; (2) represents that goods or services are of a particular standard, quality, or grade if they are of another; or (3) engaging in any other conduct which creates a likelihood of confusion or misunderstanding.

138.    Ford is a "person" within the meaning of 815 ILCS 510/1(5).

139.    Ford's actions, as alleged herein, constitute deceptive, unfair, fraudulent, and unlawful practices committed in violation of 815 ILCS 510/1, et seq.

140.    All of the conduct alleged herein occurred in the course of Ford's business and was part of a pattern or generalized course of conduct.

141.    Ford has long known the Vehicles are defective—including when it developed, manufactured, marketed, and sold the Vehicles.  Ford had actual knowledge of the Defect as described herein through customer complaints prior to when Plaintiff purchased his vehicle.

142.    Ford was developing the December 2012 TSB prior to Plaintiff's purchase his Vehicle.  Ford demonstrated its knowledge of the Defect by developing the TSBs described herein to remedy the Defect.

143.    Ford knows the Defect poses serious safety risks to consumers like Plaintiff and the putative Class Members because the Defect exposes Plaintiff and the Class Members to dangerous fumes—including carbon monoxide—during the regular, foreseeable, and ordinary use of the Vehicles.  Plaintiffs and the putative Class Members, however, do not know that that the Defect poses a danger because Ford omits and elects not to disclose the dangerous nature of the Defect to its consumers.

144.    Nonetheless, Ford concealed the Defect from consumers—including the fact that harmful carbon monoxide can enter the cabins of the Vehicles.  Then, when Ford created TSBs to address the Defect, the TSBs did not solve the safety risk the Defect created; but rather, would require Plaintiff and putative Class Members to spend hundreds of dollars on a "fix" that was not guaranteed to resolve the problem.

145.    The TSBs hide the true danger of the Defect from Ford's consumers, and lead them to believe that the Defect is fixed when, in fact, dangerous carbon monoxide fumes continue to enter the Vehicles' cabins.

146.    The Defect created and continues to create serious safety risks, which were hidden from consumers, and continue to be hidden from customers because the TSB does not acknowledge the dangerous nature of the Defect.

147. No reasonable consumer would have knowingly bought or leased a Vehicle if that consumer had known it was manufactured and distributed with the Defect.

148. Ford did not recall the defective Vehicles, nor did it notify consumers that the Vehicles could allow harmful carbon monoxide to enter the Vehicles' cabins, were dangerous to occupants, and should be replaced.

149. Ford owed Plaintiff and the putative Class Members a duty to disclose the true safety and reliability of the Class Vehicles because Ford: (1) possessed exclusive knowledge of the dangers and risks posed by the Defect; (2) intentionally concealed the dangers and risks posed by the Defect; and/or (3) made incomplete representations about the safety and reliability of the Vehicles while purposefully withholding material facts from Plaintiff that contradicted those representations.

150. By concealing the serious and material safety risk posed by its Vehicles, and representing that the Vehicles were safe, Ford engaged in actionable conduct within the meaning of the DTPA.

151. Further, by issuing TSBs that purportedly address the Defect, while knowing that dangerous carbon monoxide is still entering the cabins of the Vehicles, Ford is continuing to engage in actionable conduct within the meaning of the DTPA.

152. Had Ford disclosed the true quality and defective nature of the Vehicles, or that the TSB does not actually resolve the Defect, Plaintiff putative Class Members would not have purchased the Vehicles, would have paid substantially less for them, or would have stopped driving them.

153.    Ford breached its duty to disclose the safety risks and the Defect when it instead sold and distributed the Class Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk.

154.    Ford's deceptive, unfair, fraudulent and unlawful conduct alleged herein was designed to induce and did induce Plaintiff and the putative Class Members to purchase the Class Vehicles.

155.    Ford's deceptive, unfair, fraudulent and unlawful conduct alleged herein was designed to prevent Plaintiff and the putative Class Members to continue to drive the Vehicles, not complain, and not demand that Ford devise a real solution to the Defect.

156.    Ford violated the DTPA when it concealed and/or failed to disclose the serious safety risks to consumers that its Class Vehicles posed, when it concealed and/or failed to disclose the fact that the Class Vehicles were defective as described herein, and when it sold and distributed the Vehicles as if they were fit for their ordinary purposes, could be used safely, and did not pose an unreasonable safety risk when its customers continued to drive the Vehicles.

157.    Plaintiff and Class Members are at risk of immediate and serious future harm as Ford has not remedied the Defect in the Vehicles, nor has it determined a way to fix the Vehicles so as to ensure that carbon monoxide does not enter into the Vehicles' cabins.

158.    Plaintiff and the Class Members are also at risk of immediate and future harm, as Ford's continued pattern of issuing new TSBs, as evidenced by the proposed settlement in the *Sanchez-Knutson* case, will result in further misinformation about the nature of the defect and false assurances that the problem has been solved.  Plaintiff and the other Class members will suffer damage in that Ford's misrepresentations will impede further efforts to remedy the problem which might be imposed by authorities such as the NHTSA.  Further, Plaintiff and

other Class members may spend unnecessary monies to get fixes performed pursuant to the TSBs issued such as that proposed in the *Sanchez-Knutson* case settlement, which will not in fact cure the problem.

159.    As a direct and proximate result of Ford's violation of the Illinois DTPA, Plaintiff and the putative Class Members were damaged.

160.    Ford needs to be enjoined from stating that these new TSBs will cure the problem or that there is no problem, and from making further statements that imply that the issue is an "Exhaust Odor" problem or that the vehicles are safe, when they clearly are not, either before or after the TSBs are implemented.

161.    As a result of Ford's unlawful practices, injunctive relief is appropriate to require Ford to develop a fix to the dangerous Defect, and develop a common fund to provide that fix to Plaintiff and all Class Members.

## Fourth Cause Of Action
### Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS 505/1
On behalf of Plaintiff and the Putative Class

162.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

163.    At all times relevant hereto, there was in full force and effect the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et seq. ("the CFA").

164.    Plaintiff and other Class Members may sue as consumers within the meaning of the CFA because Ford's business activities involve trade or commerce, are addressed to the market generally, and otherwise implicate consumer protection concerns.

165.    Section 2 of the CFA renders unlawful the "use or employment of any deception [including the] concealment, suppression or omission of any material fact, with the intent that

41

others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce."

166.    When Ford developed, manufactured, marketed and sold the Class Vehicles, it was involved in the conduct of trade and commerce under the CFA.

167.    At the time Ford developed, manufactured, marketed, and sold the Vehicles, it knew that they contained a defect that poses serious safety risks to consumers like Plaintiff and Class Members.  At a minimum, Ford knew that its Vehicles were defective prior to Plaintiff's purchase of his vehicle, because Ford was in the process of creating a Technical Service Bulletin to address noxious odors that were entering the cabins of the Class Vehicles when Plaintiff purchased his vehicle.

168.    Ford issued a Technical Service Bulletin in December 2012 (12-12-4) acknowledging that 2011-2013 Ford Explorers can leak exhaust fumes into the passenger compartments of the Vehicles.

169.    In order to create this TSB, Ford had knowledge of the Defect, and examined so-called "repairs" to the Defect.

170.    Nonetheless, Ford concealed its knowledge of the Defect from consumers like Plaintiff and Class Members and instead sold its Class Vehicles as safe for normal use.  Ford did this by marketing the cars as safe, and, when Ford became aware of the Defect and attempted to fix it, misrepresenting the true nature of the Defect by downplaying its impact on consumer safety by, among other things, not disclosing that the fumes entering the Vehicles cabins contain carbon monoxide.

171.    The Defect poses safety risks to consumers and was hidden from the consumers.

172.    As described herein, Ford acknowledged complaints regarding the Defect since at least July of 2011.

173.    Ford intentionally concealed the unreasonable safety risks associated with the defective Class Vehicles which were material facts to consumers like Plaintiff and Class Members. Indeed, no reasonable consumer would have knowingly bought a Class Vehicle for use if that consumer had known that the product was designed with a serious defect.

174.    The Defect exists at the point of sale of the Class Vehicles.  Ford knew that some owners and lessees of the Class Vehicles may not have discovered the Defect until after the warranty period expired.  Ford purposefully chose to conceal the safety defects in the Class Vehicles so that it would not have to repair all of the Class Vehicles.

175.    Ford's intentional misrepresentations, omissions and concealments of material fact constitute unfair and/or deceptive practices in violation of the CFA.

176.    Ford violated the CFA not only when it sold the Class Vehicles representing them to be safe, but when it failed to disclose to Plaintiff and the Illinois class members that the Class Vehicles had a Defect that poses serious safety risks to consumers and the public despite its knowledge of the Defect and its safety risk.

177.    Ford's deceptive practices were designed to induce Plaintiff and the Class Members to purchase or lease the Class Vehicles containing the defect and to avoid the cost of replacing, retrofitting, and/or repairing the defective Class Vehicles already in use by thousands of consumers throughout Illinois.

178.    Ford's deceptive practices were also designed to avoid the costs related to repairing thousands of vehicles that contained a defect at the point of sale.

179.    Ford's violations of the CFA were designed to conceal, and Ford failed to disclose, material facts about the defect and the unreasonable safety risks of the Class Vehicles in order to induce Plaintiff and the Class Members to purchase the Class Vehicles and in order to avoid the cost of replacing, repairing or retrofitting the Class Vehicles.

180.    Plaintiff and the Class Members suffered injury in-fact as a direct result of Ford's violations of the CFA in that they have paid for Class Vehicles that pose an immediate safety risk and will have to be repaired or replaced.

181.    Had Ford disclosed the true quality, and defective nature of the Vehicles, Plaintiff and Class Members would not have purchased the Vehicles or would have paid substantially less for them.

182.    Plaintiff and Class Members have also been denied the use of their Vehicles, expended money on replacements, repairs, and extended warranties, and suffered unreasonable diminution in value of their Vehicles as a result of Ford's conduct.

183.    To this day, Ford continues to violate the CFA by concealing the defective nature of the Vehicles in failing to notify customers of the serious safety issues posed by the Defect, in failing to issue a TSB that correctly and completely repairs the problem, and in collecting the profits from costly repairs and replacements.

184.    As a direct and proximate result of Ford's unfair acts or practices alleged herein, Plaintiff and Class Members were damaged.

**Fifth Cause Of Action**
**Common Law Fraud**
On behalf of Plaintiff and the Putative Class

185.    Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

186. When Ford sold the Vehicles to Plaintiff and the putative Class Members it knew, or was reckless in not knowing, that the Vehicles contained a material safety Defect. When Ford discovered the Defect, it continued to falsely misrepresent that its Vehicles were safe, despite being aware of the material safety Defect contained in the Vehicles' exhaust systems, and even issued TSBs which purported to address any problems with the Defect, while withholding important information about the Defect, but would in reality not repair the Defect at all.

187. Plaintiff and the Class were unaware of the fact that the Vehicles had the Defect. Rather, Plaintiff and that putative Class Members would be reasonable in relying on Ford's representations of the Vehicles' safety, and purchased the Vehicles believing them to be safe.

188. As demonstrated herein, Ford had actual knowledge of the Defect since at least July of 2011, when it began communicating with consumers about the Defect.

189. Plaintiff and the Class reasonably relied on Ford's material misrepresentations regarding the safety of the Vehicles.

190. Plaintiff and the Class have been proximately damaged as a result of their reliance on Ford's misrepresentations in that they purchased Vehicles believing them to be safe when, in fact, they are not.

191. The safety of the Vehicles is a primary selling point to Plaintiff and the Class. Had Plaintiff and the Class Members known that the Vehicles were not safe to drive, they would not have purchased them.

192. Ford fraudulently concealed from and/or intentionally failed to disclose to Plaintiff, the Class, and all others in the chain of distribution (e.g., concealments and omissions in Ford's communications with wholesalers, retailers, and others in the chain of distribution that

were ultimately passed on to Plaintiff and the Class) the true nature of the Vehicles, which is that they contain the Defect.

193.    Rather, as described herein, Ford represented its Vehicles as safe, and, in touting certain features of the Vehicles, failed to disclose the risk of carbon monoxide entering the Vehicles' cabins.

194.    Further, Ford failed to disclose the full nature of the Defect, choosing to omit critical safety information from the TSBs it issued to its authorized servicers and dealerships.

195.    Ford had a duty to disclose material facts regarding the true nature of the Vehicles because:

   a.   Ford had exclusive knowledge of the true properties of the Vehicles at the time of sale;

   b.   The Defect is not something that Plaintiff or Class Members could, in the exercise of reasonable diligence, have discovered independently prior to purchase;

   c.   Ford undertook active steps to conceal material facts regarding the safety of the Vehicles.  Plaintiff is aware of nothing in any of Ford's advertising, publicity, or marketing materials that discloses the truth about the Defect in the Vehicles, despite ample evidence that Ford was aware of the problem by virtue of, if nothing else, numerous consumer complaints; and

   d.   Ford made and continues to make partial representations about the Vehicles through its TSBs but also suppresses material facts. These partial representations give rise to a duty to disclose the full story—that the Vehicles contain the Defect—despite Ford's promises to the contrary.

46

196.    The facts concealed and/or not disclosed by Ford to Plaintiff and Class Members are material facts in that a reasonable person would have considered them important in deciding whether to purchase an affected Vehicle.

197.    Ford intentionally concealed and/or failed to disclose the fact that the Vehicles contain the Defect for the purpose of inducing Plaintiff and Class Members to purchase the Vehicles, and to avoid the cost of fixing thousands of Class Vehicles as the Defect described herein exists at the point of sale of the Vehicles..

198.    Ford's conduct has been and is wanton and/or reckless and/or shows a reckless indifference to the interests of others.  Ford has acted with malice by engaging in conduct that was and is intended by Ford to cause injury to the Plaintiff and Class Members.

199.    Plaintiff and the Class Members justifiably acted or relied to their detriment upon the concealed and/or non-disclosed facts as evidenced by their purchase of the Vehicles.

200.    Had Plaintiff and Class Members known that the Vehicles contained the Defect, they would not have purchased an affected Vehicle.

201.    As a direct and proximate cause of Ford's misconduct, Plaintiff and Class Members have suffered actual damages in that they bought and own Vehicles that do not perform as promised, did not receive the benefit of their bargain, and are now left with Vehicles with reduced and diminished value in the marketplace.

202.    Plaintiff, on behalf of himself and all others similarly situated,  demands judgment against Ford for actual and punitive damages for themselves and each member of the Class, plus attorneys' fees for the establishment of a common fund, interest, and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays that the Court enter judgment against Ford, and in favor of Plaintiff and the Class Members, and to award the following relief:

A.      Certify the proposed Class under Rule 23(b)(2), Rule 23(b)(3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure and appointment of Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Declare that the Vehicles contain a material safety Defect as described herein;

C.      Determine that Ford's conduct as alleged herein, including for example in concealing the existence of the exhaust leak defect, and in communicating in Technical Service Bulletins, public statements or otherwise, that there is either no exhaust leak defect or that the defect is limited to an unpleasant odor, is unlawful, unfair, and/or deceptive and otherwise in violation of law, and enjoin such future conduct by Ford;

D.      Require Ford to develop a fix to address the Defect, and create a fund to allow Class Members to get the repair free of charge and as part of the warranties provided when purchasing or leasing the Vehicles;

E.      Award Plaintiff and the Class Members actual, compensatory, and/or statutory damages, as proven at trial;

F.      Award Plaintiff and the Class Members exemplary damages in such amount as proven;

G.      Award damages and other remedies, including, but not limited to, restitution and statutory penalties, as allowed by any applicable law, such as the consumer laws of Illinois;

H.      Award Plaintiff and the Class Members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest; and

I.      Award Plaintiff and the Class Members such other further and different relief as the case may require or as determined to be just, equitable and proper by this Court.

## JURY DEMAND

Plaintiff, on behalf of himself and all similarly situated persons, demands a trial by jury on all issues that are triable to a jury.

Dated: November 28, 2016

/s/ Amy E. Keller
Edward A. Wallace
eaw@wexlerwallace.com
Amy E. Keller
aek@wexlerwallace.com
Adam Prom
ap@wexlerwallace.com
**WEXLER WALLACE LLP**
55 West Monroe St.
Ste. 3300
Chicago, Illinois 60603
Telephone: 312.346.2222
Facsimile: 312.346.0022

William M. Audet
waudet@audetlaw.com
Steven R. Weinmann
sweinmann@audetlaw.com
Joshua C. Ezrin
jezrin@audetlaw.com
**AUDET & PARTNERS, LLP**
711 Van Ness, Suite 500
San Francisco, CA 94102
Telephone: 415.982.1776
Facsimile: 415.576.1776

*Attorneys for Plaintiff and the Putative Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing was filed via this Court's CM/ECF service, which will send notification of such filing to all counsel of record this 28th day of November 2016.

/s/ Amy E. Keller          
Amy E. Keller